# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### October 3, 2012 Session

## PATRICIA CARLENE MAYFIELD v. PHILLIP HAROLD MAYFIELD

**Appeal by Permission from the Court of Appeals, Middle Section**
**Circuit Court for Warren County**
**No. 3241      Larry B. Stanley, Jr., Judge**

---

**No. M2010-01383-SC-R11-CV - Filed December 3, 2012**

---

We granted review in this divorce case to determine whether the Court of Appeals erred by reversing the trial court's denial of transitional alimony. The trial court divided the parties' real and personal property, awarded custody of their children to the wife, and declined to award spousal support to the husband. The Court of Appeals affirmed the trial court's custody determination and, except for the trial court's refusal to divide the wife's post-separation income, upheld the classification and division of the marital estate. However, the Court of Appeals reversed the trial court's judgment regarding spousal support and ordered the wife to pay the husband transitional alimony in the amount of $2000 per month for thirty-six months. We conclude that the trial court did not abuse its discretion in declining to award the husband transitional alimony. Accordingly, we reverse that portion of the Court of Appeals' judgment awarding the husband transitional alimony but affirm in all other respects the intermediate appellate court's decision.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals
Reversed in Part and Affirmed in Part**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Amy J. Farrar, Murfreesboro, Tennessee, Donald N. Capparella, Nashville, Tennessee, and Thomas Bratcher, McMinnville, Tennessee, for the appellant, Patricia Carlene Mayfield.

Thomas F. Bloom, Nashville, Tennessee, and J. Hilton Conger, Smithville, Tennessee, for the appellee, Phillip Harold Mayfield.

# OPINION

## Factual and Procedural History

Patricia Carlene Mayfield ("Wife") and Phillip Harold Mayfield ("Husband") met in 1989 while Wife attended pharmacy school and Husband worked in the tool-and-die industry. They married in 1992 and separated in 2008. Throughout their seventeen-year marriage, Wife worked outside the home as a pharmacist. In 2008, the year before the divorce, she earned $156,000 managing a pharmacy for Wal-Mart. Husband, who had completed two years of college, worked as a maintenance machinist and a tool-and-die maker before the parties married. After the marriage, Husband began working full time as a cattle farmer, and Husband had no employment other than farming during the marriage.

Husband testified that he made little or no profit farming. When asked at trial whether he planned to continue farming after the divorce, he replied "maybe." Husband testified that he could work in another occupation but said that he had been unable to find a job. However, Husband had completed only two job applications in two years.

Dr. Rodney Caldwell, a vocational expert, testified that Husband is capable of performing heavy labor, as evidenced by his farming activities, and that Husband has job skills suitable to work as an agricultural manager. Dr. Caldwell explained that Husband is also qualified to work in sales, in particular, sales of agricultural supplies and equipment, auto parts, and building supplies. Dr. Caldwell further testified that Husband has the skills needed to work as a truck driver, an equipment operator, a veterinary technician, or a drilling-and-boring machine operator, and that these positions pay between $24,400 and $57,000 per year. Dr. Caldwell opined that Husband could become qualified to work as a draftsman by completing less than a year of training. Husband's brother-in-law, a tool-and-die maker, testified that the industry had become more automated, and in order for Husband to resume the trade, he would need to complete a class on the operation of the machines now used in the industry.

During the marriage, the parties maintained a modest lifestyle, living in a two-bedroom, one-bathroom "basement house" heated with a wood stove. The house, described at trial as "pretty rudimentary," was built partially below ground with temporary finishes because it was not meant to be a permanent residence. Wife paid all of the family's bills. Rather than improving the house, the parties, at Husband's insistence, used Wife's income to buy land for Husband's farming operation. The parties acquired about 150 acres during the marriage.

The parties had two children, ages eight and eleven, at the time of trial. The parties agreed that Husband would care for the children while he farmed and Wife worked outside the home. Although Wife expected Husband to go back to work once the children started school, he never returned to work. According to Wife, he slept much of the time and paid others to work the farm. Family members mowed the couple's lawn. Wife's mother described Husband as "lazy" and expressed her opinion, formed over many years, that he would never work. Other witnesses described him as someone who dislikes people, flies into rages, and does not want visitors in his home. Wife testified that, despite working long hours outside the home, she did most of the household chores, including hauling wood for their stove. Husband disputed Wife's testimony and claimed that he did most of the household chores and cared for the children, getting them ready for school, making their lunches, and providing their transportation.

The parties' marriage fell apart due to Husband's physical abuse of Wife. Angry that she worked long hours and jealous that she worked with men, Husband abused Wife by pulling her hair, slapping her face, twice breaking her nose, throwing her to the ground in the presence of neighbors, and breaking her finger. Husband also stood atop Wife's bare feet on occasion, grinding and twisting his heels, which caused extensive bruising to her feet. He flipped over a chair in which she was seated, and on another occasion, forced her to sit in a chair for thirty minutes while he doused her with water. On separate occasions he forced her out of their house on a winter night after removing most of her clothing, locked her out of their house while she was wearing only her underwear, and slung her by her hair into a car parked in their driveway.

Husband also once tried to cram a bed sheet into Wife's mouth, pushing it in with his thumbs so that she could not scream, and on another occasion, he pointed a gun at her. More than once, Husband hit Wife in the face while she was driving, and on another occasion, while the children were in the car, Husband tried to shift the car to park while it was moving at a speed of sixty-five miles per hour. When Wife stopped the car to run for help, Husband grabbed her hair and prevented her from fleeing. On still another occasion, Wife locked herself inside her car to escape a beating, but Husband threatened to kill her if she did not unlock the doors. She complied with his demand, and the beating continued.

Wife occasionally slept with the children because they all feared Husband. On one such occasion, Husband reached over one child, grabbed Wife's feet, and pulled her from the top of a bunk bed, causing her to strike every rung of the ladder on her way down. Although Wife begged Husband to stop and pleaded with him not to hurt her, he grasped her hair and pulled her through the house. Wife described another incident in which Husband "busted" her nose, causing her to gag and choke on her own blood. Wife also recalled Husband beating her with a clothes hanger, and she remembered having "blood on [her] many times."

Wife's co-workers, family members, and neighbors testified concerning the extensive bruising they noticed on Wife's body, particularly the tops of her feet, but also on her face, neck, arms, legs, and back. They also recalled seeing bald spots, as if Wife's hair had been pulled from her head, and noticed that her earlobe had been torn from the side of her face. One co-worker testified that she occasionally called Wife at home to make sure she was still alive. Other co-workers had overhead Husband tell Wife in a phone conversation that whether he beat her that day when she arrived home from work would depend on her. Co-workers also overheard Husband threatening to come to the Wal-Mart where Wife worked if she failed to come home, causing Wife's co-workers to fear possible violence.

Wife tried to conceal the injuries Husband inflicted with heavy make-up and clothing, including wearing turtle-neck shirts in the summer. Husband insisted that Wife use more make-up to conceal the bruises on her face, but when the bruising became too extensive to conceal, Husband "started bruising [Wife] where people couldn't visually see it." When Wife's mother confronted Husband about the abuse, he told her that Wife could not leave him until she had used her income to pay for his farmland. Fearing for her life, Wife eventually took the children and fled the marital home with only the clothes they were wearing.

Some of Husband's brutality occurred in the presence of the parties' children, prompting their eight-year-old son to threaten a call to 911. When Husband made a hole in the bathroom door by hitting Wife, the children covered it with a picture they had drawn.[1] The children also were present and crying hysterically on one occasion when Husband knocked Wife down on the pavement in front of a neighbor. After assaulting Wife, Husband approached the neighbor and screamed in her face, "you did not see me throw her down," to which the neighbor replied, "yes, I did." After the neighbor called the police, Husband taunted her whenever they passed on the road, causing her to feel intimidated.

Although Husband pleaded guilty to assault as a result of this incident, at the divorce trial he steadfastly, repeatedly, and unequivocally denied ever abusing Wife. Husband claimed to be mystified by the bruises and marks on her body and the clumps of hair missing

---

[1] Although custody is not an issue in this Court as it was in the courts below, the record suggests that Husband also abused the parties' eleven-year-old daughter. According to the daughter's affidavit contained in the record, Husband spat in her face, slapped her hard across the face, held her head in a sink while pulling her hair, and repeatedly hit her with "a plastic [object] which he used as a stick or a bat," leaving marks on her body. The trial court terminated Husband's visitation with his daughter due to this abuse. The record also reveals that the Department of Children's Services filed a dependent and neglect petition alleging that Husband failed to give his son medication for a life-threatening heart condition during a week of visitation. A medical professional testified that the medicine regulated the boy's heart rate.

from her head. Husband also said the neighbor who witnessed his assault on Wife had lied because she was jealous of him.[2]

In any event, the trial court granted Wife a divorce based on Husband's inappropriate marital conduct, designated her the primary residential parent, divided the marital estate, and declined to divide Wife's post-separation income. The trial judge found that the evidence of physical abuse, substantiated by several witnesses whom the trial judge found to be credible, was overwhelming. The trial judge described Husband's testimony as inconsistent and "incredulous." The trial court declined to award Husband alimony, finding that Husband was willfully underemployed, had an earning capacity of $45,000 per year, and had the capacity to earn a living for himself farming because he had been awarded the farm in the divorce.[3] The trial judge also found that Husband was capable of working in an occupation other than farming, had no substantial financial obligations, needed no further extensive educational training, and could return to the tool-and-die industry by completing a brief class on the operation of certain machines. In addition, the trial judge determined that each party was physically and mentally capable of providing for themselves and could work full time without detriment to the children. The trial judge also observed that Husband had a house, furnishings, a farm truck, and cash and, as a result, "will not require large amounts of additional funds to live." The trial judge expressly found that Husband would be able to maintain the same standard of living after the divorce that the parties enjoyed during the marriage. The trial judge also considered the parties' contributions to the marriage, financially and otherwise, as well as Husband's fault in destroying the marriage by his abusive and violent treatment of Wife.

Husband appealed. The Court of Appeals affirmed the trial court's custody determination and its classification and division of the marital estate, but the Court of Appeals concluded that the trial court erred by refusing to divide Wife's post-separation

---

[2] In a striking reversal, Husband has admitted in briefs filed in this Court "that [his] behavior during the last year of the marriage was inexcusable. He was violent and abusive. In fact, his violence caused [Wife] to flee the marital home."

[3] Although the record on appeal does not include any pleading, motion, or paper reflecting that Husband requested spousal support, we presume Husband made such a request because the trial court addressed the issue in its final decree. We recently commented that, while not required by the Rules of Civil Procedure, "it may be prudent for parties to set forth in their pleadings the specific types of alimony sought." Gonsewski v. Gonsewski, 350 S.W.3d 99, 114 n.11 (Tenn. 2011). We cannot determine whether Husband asked the trial court for a specific type of alimony. However, we note that in his Court of Appeals' brief, Husband argued only that he was entitled to rehabilitative and in futuro alimony and did not seek transitional alimony, which the Court of Appeals awarded.

income.[4]  After deducting Wife's post-separation moving and living expenses, the Court of Appeals awarded Wife 54.2% and Husband 45.8% of Wife's post-separation income. Regarding spousal support, the Court of Appeals reversed the trial court's judgment and awarded Husband $2000 per month in transitional alimony for thirty-six months.  The Court of Appeals refused to award in futuro or rehabilitative alimony, finding that Husband is fully capable both "of finding suitable employment utilizing his skills in farming or in the tool and die industry" and "of achieving an earning capacity that will allow him to maintain an appropriate standard of living."  Mayfield v. Mayfield, No. M2010-01383-COA-R3-CV, 2012 WL 134812, at *14 (Tenn. Ct. App. Jan. 17, 2012).  However, the intermediate appellate court awarded transitional alimony because Husband had remained at home caring for the children, thereby suffering an economic detriment for the benefit of the marriage, while Wife had advanced in her career.  Although the Court of Appeals acknowledged that Husband's abuse of Wife contributed to the divorce and should be considered, the intermediate appellate court concluded that transitional alimony of $2000 per month for thirty-six months would allow Husband to adjust to the economic consequences of the divorce.

We granted Wife's application for permission to appeal.

**Standard of Review**

The sole issue before this Court is whether the Court of Appeals erred by reversing the trial court's judgment declining to award Husband alimony.  This Court has frequently recognized that trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award.  See Gonsewski, 350 S.W.3d at 105; Bratton v. Bratton, 136 S.W.3d 595, 605 (Tenn. 2004); Burlew v. Burlew, 40 S.W.3d 465, 470 (Tenn. 2001); Crabtree v. Crabtree, 16 S.W.3d 356, 360 (Tenn. 2000).  Because a trial court's "decision regarding spousal support is factually driven and involves the careful balancing of many factors," Gonsewski, 350 S.W.3d at 105 (footnote omitted), the role of an appellate court is not to second guess the trial court or to substitute its judgment for that of the trial court, but to determine whether the trial court abused its discretion in awarding, or refusing to award, spousal support.  Id.  "An abuse of discretion occurs when the trial court causes an injustice by applying an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice."  Id. (citing Wright ex rel. Wright v. Wright, 337 S.W.3d 166, 176 (Tenn. 2011); Henderson v. SAIA, Inc., 318 S.W.3d 328, 335 (Tenn. 2010)).  In determining whether the trial court abused its discretion, an

_____

[4] Neither party raises any issue in this Court as to the award of custody, the classification and division of the marital estate, or the Court of Appeals' division of Wife's post-separation income.

appellate court "should presume that the [trial court's] decision is correct and should review the evidence in the light most favorable to the decision." Gonsewski, 350 S.W.3d at 105-06; see also Tenn. R. App. P. 13(d) ("[R]eview of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding[s], unless the preponderance of the evidence is otherwise.").

**Analysis**

Tennessee recognizes four distinct types of spousal support: (1) alimony in futuro, (2) alimony in solido, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1) (2010 & Supp. 2012). Alimony in futuro, a form of long-term support, is appropriate when the economically disadvantaged spouse cannot achieve self-sufficiency and economic rehabilitation is not feasible. Gonsewski, 350 S.W.3d at 107. Alimony in solido, another form of long-term support, is typically awarded to adjust the distribution of the marital estate and, as such, is generally not modifiable and does not terminate upon death or remarriage. Id. at 108. By contrast, rehabilitative alimony is short-term support that enables a disadvantaged spouse to obtain education or training and become self-reliant following a divorce. Id.

Where economic rehabilitation is unnecessary, transitional alimony may be awarded. Transitional alimony assists the disadvantaged spouse with the "transition to the status of a single person." Id. at 109 (internal quotation marks omitted). Rehabilitative alimony "is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency," whereas "transitional alimony is designed to aid a spouse who already possesses the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income." Id. Consequently, transitional alimony has been described as a form of short-term "bridge-the-gap" support designed to "smooth the transition of a spouse from married to single life." Engesser v. Engesser, 42 So. 3d 249, 251 (Fla. Dist. Ct. App. 2010).

Transitional alimony is payable for a definite period of time and may be modified only if: (1) the parties agree that it may be modified; (2) the court provides for modification in the divorce decree, decree of legal separation, or order of protection; or (3) the recipient spouse resides with a third person following the divorce. Tenn. Code Ann. § 36-5-121(g)(2).

Tennessee statutes concerning spousal support reflect a legislative preference favoring rehabilitative or transitional alimony rather than alimony in futuro or in solido. See Tenn. Code Ann. § 36-5-121(d)(2)-(3); Gonsewski, 350 S.W.3d at 109. Not even long-term support is a guarantee that the recipient spouse will be able to maintain the same standard of living enjoyed before the divorce because "two persons living separately incur more expenses

than two persons living together." Gonsewski, 350 S.W.3d at 108 (quoting Kinard v. Kinard, 986 S.W.2d 220, 234 (Tenn. Ct. App. 1998)). Although the parties' standard of living is a factor courts must consider when making alimony determinations, see Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the marriage. Gonsewski, 350 S.W.3d at 113. Decisions regarding the type, length, and amount of alimony turn upon the unique facts of each case and careful consideration of many factors, with two of the most important factors being the disadvantaged spouse's need and the obligor spouse's ability to pay. Id. at 109-10.

Guided by the foregoing principles, we turn to the specific circumstances of this case. Wife contends that the trial court correctly determined that Husband failed to prove a need for alimony and that the high degree of fault attributable to him weighs against such an award. Further, she insists that Husband is capable of finding suitable employment and earning a living that will allow him to maintain his modest standard of living. She also asserts that the trial court applied the correct legal standards in declining to award Husband spousal support and that the trial court's refusal to award alimony was reasonable. Wife maintains that the trial court considered Husband's need and expressly found that his standard of living after the divorce will be the same as it was during the marriage because he received the marital home and farm and has little or no debt.

Husband responds that the award of transitional alimony was appropriate because Wife's income far exceeds his own, his farming operation has not been profitable, he has not worked in the tool-and-die industry in many years, and he stayed home during the marriage to care for the children. Husband maintains that although he has completed two years of college, he has been out of the workforce for approximately twenty years and, without further training, would be restricted to low-paying retail jobs. Husband points out that the parties were married for approximately seventeen years, that they are both in their mid-forties, and that neither suffers from any physical or mental impairments. He also argues that Wife will be able to maintain a higher standard of living given her income, which he enabled her to attain by staying home with the children and allowing her to climb the corporate ladder. Accordingly, he urges this Court to affirm the award of transitional alimony.

As already noted, the trial court denied Husband's request for alimony after considering the factors listed in section 36-5-121(i).[5] The trial court determined that

---

[5] The pertinent factors include:

    (1) The relative earning capacity, obligations, needs, and financial

(continued...)

Husband was willfully underemployed, had an earning capacity of $45,000 per year, and could make a living for himself farming because he received the farm in the divorce. The trial court also determined that Husband was capable of working in an occupation other than farming, had no significant financial obligations, did not need extensive educational training, and could return to the tool-and-die industry by completing a brief course on operating

---

[5](...continued)

resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i).

certain machines. Further, the trial judge found that both Husband and Wife were physically and mentally capable of providing for themselves and working full time without detriment to the children. In addition, the trial judge observed that Husband had a house, furnishings, a farm truck, and cash and could maintain his pre-divorce standard of living without spousal support. The trial judge also considered the parties' contributions to the marriage, financially and otherwise, as well as Husband's fault in abusing Wife.

As noted, transitional alimony is designed to aid a spouse who already has the capacity for self-sufficiency but needs financial assistance in adjusting to the economic consequences of establishing and maintaining a household without the benefit of the other spouse's income. Here, the evidence showed that Husband is capable of working full time and earning a living that will allow him to maintain the parties' pre-divorce standard of living. Husband received the marital home and farm, meaning that he will be able to continue his farming operation without interruption and with little or no debt. According to the testimony in the record, only a brief refresher course stands in the way of Husband resuming his career in the tool-and-die industry. In addition, the proof shows that Husband is capable of performing heavy labor and has job skills suitable for work in a variety of positions, including sales of agricultural supplies and equipment, auto parts, and building supplies. The proof also shows that Husband is qualified to work as a truck driver, an equipment operator, a veterinary technician, and a drilling-and-boring machine operator, jobs that pay between $24,400 and $57,000 per year. Husband's testimony that he has been unable to find work is unpersuasive given the proof that he has completed only two job applications in two years.

Although Husband claims that his willingness to stay home during the marriage advanced Wife's career, he ignores the proof that she turned down a district management position at his insistence. According to Wife's uncontroverted testimony, Husband actually impeded her career advancement. The proof shows that Wife was able to work in her field despite Husband's abusive and unsupportive conduct, not because Husband did anything to assist or encourage her.[6] Indeed, Husband readily admitted at trial that he "never" encouraged Wife to advance in her career. Although Husband asserts that Wife would not have received raises had he not stayed home with the children, Husband cites no evidence, nor have we found any, supporting this assertion.

The proof shows that Husband's abuse of Wife tainted her workplace, as Wife's co-workers saw firsthand her injuries and overheard Husband's threats to come to her place of employment if she failed to come home. Husband also required Wife to give him her paychecks, and if she refused, he would beat her. Husband would lock Wife's paychecks and

---

[6] Despite her bleak circumstances at home, Wife received one of two awards given by Wal-Mart to its employees nationwide. She received the "best performance" award for the United States.

the couple's checkbook in his truck, to which Wife did not have a key. In short, the proof establishes that Husband did not support Wife in her professional endeavors.

On the other hand, there is no proof to suggest that Husband's willingness to remain at home and care for the children hindered his farming operation. Nor is there any evidence to suggest that Husband suffered an economic detriment of any kind by virtue of caring for the children while Wife worked outside the home.

Additionally, the evidence concerning the relative fault of the parties weighs heavily against awarding Husband spousal support, as the Court of Appeals acknowledged. Although Husband argues that Wife should bear some of the blame for the divorce because she worked long hours, this argument is refuted by Wife's testimony that she worked long hours "because every time I would come home, I was getting beat[en]." According to Wife, she was simply "trying to survive" by remaining at work away from Husband. Husband conceded in his brief filed in this Court "that [his] behavior during the last year of the marriage was inexcusable. He was violent and abusive. In fact, his violence caused [Wife] to flee the marital home." We decline to hold that Wife should bear partial fault for the divorce because she worked long hours to avoid physical abuse.

Moreover, based on this record, it would be patently unjust to force Wife to continue supporting the person who repeatedly beat her to the point that she feared for her life and fled her home with her children and only the clothes they were wearing.[7] Despite Husband's deplorable treatment of Wife, she continued to give him cash and make his vehicle and land payments, even after she took the children and fled in fear of her life.[8] Unlike Husband, Wife had to start anew after the divorce in terms of housing, furnishings, clothing for herself and the children, and other necessities, because she left the parties' home abruptly to escape Husband's abuse. While we do not imply that spousal support should never be awarded to an abusive spouse, the trial court did not abuse its discretion by declining to award Husband alimony, based on the circumstances of this case.

We also note that there is a complete lack of evidence that Husband needed financial assistance to adjust to life as a single person, which, as already explained, is the purpose of transitional alimony. Gonsewski, 350 S.W.3d at 109. Although the Court of Appeals found that transitional alimony was appropriate to assist Husband in adjusting to the economic consequences of the divorce, the record contains no proof as to these economic consequences, a point Husband acknowledged at oral argument. In fact, the subject of

---

[7] We agree with the trial judge that the evidence of Husband's abuse of Wife was overwhelming.

[8] Wife testified that she never called the police because she was embarrassed and ashamed.

-11-

alimony received little attention at trial, other than Husband's testimony that he wanted Wife to continue supporting his unprofitable farming operation. The record is silent on what, if anything, Husband will be unable to do as he adjusts to life as a single person without an award of transitional alimony. To reiterate, the record shows that Husband received the marital home, furniture, appliances, and other contents, as well as the farmland. Although Husband testified that he would be dependent on Wife's support until he "retrained on something," it is undisputed that he is healthy and capable of working and that he possesses marketable job skills. The trial court did not abuse its discretion by finding such a vague assertion insufficient to support an award of transitional alimony.

The Court of Appeals' award of transitional alimony is also inconsistent with this Court's recent decision in Gonsewski. In that case, the trial court declined to award alimony to a wife who had a college degree, good health, and a stable work history, making $73,500 a year, and whose husband earned approximately $137,500 the previous year. Id. at 103. The Court of Appeals reversed and ordered the husband to pay the wife alimony in futuro in the amount of $1250 per month due to the disparity in the parties' income and to "mitigate the harsh economic realities of divorce." Id. at 110. We concluded that the Court of Appeals had erred by awarding alimony in futuro because the wife had "the ability to support herself." Id. at 112. We also concluded that transitional alimony was unwarranted because the wife had failed to demonstrate that she needed "additional financial assistance in order to adjust to the economic consequences of her divorce." Id. at 115. We emphasized that the trial court had considered the support issue "in light of the appropriate factors and in light of the specific facts and circumstances of the case," id., and declined to reverse the trial court absent an abuse of discretion. Id. at 112.

The same can be said of the present case, as there was no demonstrated need for support of any kind. Indeed, the record contains no evidence at all regarding Husband's expenses, and we are not inclined to speculate about such matters. The record does establish that Husband was unsupportive of Wife's career, abusive, and underemployed. The trial court found that Husband can maintain the same standard of living after the divorce that the parties enjoyed during the marriage. Under these circumstances, we conclude that spousal support was unwarranted.

In sum, considering the evidence in a light most favorable to the trial court's decision, as Gonsewski requires, the trial court did not abuse its discretion in denying Husband alimony. The trial court considered the pertinent factors and declined to award spousal support, a decision not "clearly unreasonable." Id. at 105.

At oral argument Husband requested that we take judicial notice of his need for spousal support. "Judicial notice is defined as an acceptance by a court . . . of a well-known

-12-

and indisputable fact." State v. Lawson, 291 S.W.3d 864, 868 (Tenn. 2009) (internal quotation marks omitted); accord Benson v. H.G. Hills Stores, Inc., 699 S.W.2d 560, 563 (Tenn. Ct. App. 1985) ("Facts relating to human life, health and habits, and management and conduct of businesses which are of common knowledge may be judicially noticed."); Smith v. State, 607 S.W.2d 906, 907 (Tenn. Crim. App. 1980) ("Judicial notice is the process by which a court accepts facts as true without proof because knowledge of those facts is so notorious that everyone is assumed to possess it."). Judicial notice is a rule of convenience, intended to save time and resources by dispensing with the presentation of evidence. Lawson, 291 S.W.3d at 868. The rule is limited, however, to a fact "not subject to reasonable dispute" that is either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Tenn. R. Evid. 201(b). Clearly, a spouse's disputed need for alimony is not a fact of which judicial notice may be taken. A spouse's need for alimony must be established by proof. Indeed, absent evidence regarding need, as well as the other factors pertinent to the parties' circumstances, alimony should not be awarded. Here, it was incumbent upon Husband to offer proof establishing the nature and extent of his need for alimony, which he completely failed to do.

## Conclusion

Based upon our review of the record and applicable legal principles, we conclude that the Court of Appeals erred by reversing the trial court and awarding transitional alimony to Husband. We therefore reverse that portion of the Court of Appeals' judgment and reinstate the trial court's judgment denying Husband alimony. In all other respects, the judgment of the Court of Appeals is affirmed. The costs of this appeal are taxed to Husband and his surety, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE

-13-