IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 6, 2022 Session

## OLIVIA MAY MARCEL v. BRAD JOSEPH MARCEL

**Appeal from the Chancery Court for Coffee County**
**No. 2019-CV-377    Vanessa A. Jackson, Judge**

_____

**No. M2021-00594-COA-R3-CV**

_____

This appeal arises from a divorce proceeding.  The Coffee County Chancery Court ("Trial Court") ordered the husband to pay the wife alimony *in futuro* of $1,500 per month.  The Trial Court further ordered that the husband's child support obligation would be calculated by using his previous four pay stubs, each of which reflected a pay period of one week. Upon our determination that a period of four weeks is not a reasonable period of time to calculate child support when the parent has regularly received variable income, we vacate the Trial Court's award of child support and remand for recalculation based on the husband's income for a reasonable period of time.  We affirm the Trial Court's determination that alimony *in futuro* was appropriate in this case but vacate the Trial Court's determination of the amount of alimony for reconsideration after its calculation of the husband's child support obligation.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Vacated in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Roger J. Bean and Erica R. Marino, Tullahoma, Tennessee, for the appellant, Brad Joseph Marcel.

Eric J. Burch, Manchester, Tennessee, for the appellee, Olivia May Marcel.

# OPINION

## Background

Olivia May Marcel ("Wife") and Brad Joseph Marcel ("Husband") married in July 1999. The parties had two children during the marriage, Macy and Matthew. Matthew was 19 years old at the time of trial, and Macy was 12 years old. During the majority of Macy's life, Wife was her primary caregiver. Wife began experiencing health issues in 2016. Following an incident at her workplace in 2016, Wife was diagnosed with multiple heart issues. Specifically, Wife stated that she has inappropriate sinus tachycardia, wandering atrial pacemaker, and postural orthostatic tachycardia syndrome. She testified that she blacked out at work because her heart rate and blood pressure "bottomed out completely." The parties' adult child, Matthew, also testified of an incident when Wife went into cardiac arrest and he had to administer CPR. Wife also had been diagnosed with mental health issues – attention deficit disorder, depression, anxiety, and bipolar disorder. She takes medication for her multiple medical issues. For her attention deficit disorder, Wife is prescribed Adderall. The parties' adult son also has a prescription for Adderall. Husband's and Matthew's testimony reflects that they believed Wife had taken Matthew's Adderall in addition to her own. Wife denied this allegation.

The Trial Court found that both parties contributed to the demise of the marriage. The Trial Court found that Husband has "problems" dealing with Wife's medical conditions and that her inability to work resulted in a financial hardship for the family. According to the Trial Court, Husband believed Wife was capable of working and had subjected Wife to verbal abuse, telling her to "go mooch off someone else" and that she is not sick and should get a job. Additionally, Wife had spent several nights away from the home after telling Husband she was staying at her parents' home. However, the parties' son testified that he found Wife's vehicle in Pulaski, Tennessee parked in front of another man's home. Matthew testified that on that night, he busted the window of Wife's car and kicked off the side-view mirror. Wife denied that she spent the night with a man, stating that she was at a female friend's home. Wife denied having an affair during her marriage and testified that the man with whom Husband and Matthew had accused her of having an affair was a friend of hers and Husband's. According to Matthew, he dropped Wife off at that house a couple times, and Wife told him that the man was her boyfriend.

The Trial Court found that while not a typical occurrence for the family, a physical altercation occurred between the parties in November 2019, with each party blaming the other for the incident. According to the Trial Court, "[t]his incident seems to be the culmination of the difficulties and stress that both parties were experiencing during the demise of their marriage." Wife testified that Husband had grabbed her and threw her about eight feet onto the floor and into a table. Wife introduced a photo showing bruises on her leg. According to Wife, Matthew lied to law enforcement and told them that Wife had sprayed chemicals at Husband's face. Husband testified that Wife had sprayed

cleaning product directly in his face and that his initial response was to knock it out of her hand. He denied pushing her down and stated that she fell to the ground herself. Wife subsequently filed for an order of protection against Husband.[1]

Following the parties' separation, Husband continued to reside in the marital home, while Wife had been living with her parents. Wife did not have the resources to obtain a separate residence. The minor child, Macy, did not have her own room at Wife's parents' home. The parties shared equal parenting time with Macy during the pendency of the divorce.

The Trial Court found that Husband removed Wife from his group health insurance plan in anticipation of the upcoming divorce. The Trial Court found that Husband's plan would have cost him approximately $20 per month to keep Wife insured. We note, however, that Husband testified that Wife's health insurance cost $20 per week. According to Wife, she had not been able to see her doctor at Vanderbilt in over twelve months because Husband had cancelled her health insurance. She stated that she had paid cash during the year prior to trial and had not been able to see her doctors like she normally would. Husband acknowledged that he cancelled Wife's health insurance policy for the year 2020 during open enrollment in October 2019 and testified that he believed that "all this" would be over before the new year began. According to Husband, he removed her from the policy around the time he learned she was having an affair. Husband testified that he had not spoken with a divorce lawyer until December 2019 and that he did not know he had to keep Wife on his health insurance policy.

Husband testified that he later contacted different insurance companies to obtain insurance for Wife. During cross-examination, Wife testified that Husband had tried to put her in contact with someone to give her replacement "free insurance" for low income families but stated that she did not accept it because she was still married to Husband and the insurance was not equivalent to her insurance she had during the marriage. She testified she could not afford to pay for the deductible or expenses for that insurance policy because of her existing health conditions. Husband claimed the replacement policy was the same as the policy through his employer, and he had made sure Wife's doctors accepted the new health insurance plan.

Wife filed for divorce in the Coffee County Chancery Court ("Trial Court") in November 2019, alleging that Husband was guilty of inappropriate marital conduct or, alternatively, that the parties have irreconcilable differences. Husband filed an answer denying that he was guilty of inappropriate marital conduct and a counter-complaint alleging that Wife had committed inappropriate marital conduct, that irreconcilable

---

[1] The order of protection was consolidated with the divorce case and was voluntarily dismissed at the beginning of trial.

differences existed, or that the parties will stipulate to grounds for divorce pursuant to Tenn. Code Ann. § 36-4-129.

Wife filed a motion for *pendente lite* child support and alimony, as well as her attorney's fees. Following a hearing in December 2019, Husband was ordered to pay $400 per month to Wife for temporary spousal support. Due to her medical conditions, Wife had not been employed in several years and was receiving social security disability benefits. Wife testified that she had been on social security disability for approximately a year due to her heart issue and was receiving $1,200 per month. The Trial Court found that Wife's benefits were "inexplicably terminated" in January 2020 "after someone claiming to be the payee of the benefits called the Social Security Administration stating that Wife was no longer disabled." Husband was the designated payee on the social security account and denied making that telephone call. Notice of the cancellation was mailed to the marital home where Husband was residing and addressed to Husband as payee on the account, but Husband denied seeing the notice. The Trial Court found that Husband left the notice letter with Wife's mail in the kitchen. Wife testified that when she asked why Husband had not given her the notice letter, he informed her that "it wasn't his responsibility." Wife was attempting to get her social security disability benefits reinstated, but her only income at the time of trial was the $400 of spousal support from Husband.

The Trial Court conducted a trial in December 2020, and the following witnesses testified: (1) Wife; (2) Husband; (3) Macy, the parties' minor daughter; (4) Matthew, the parties' adult son; and (5) Amy Gilliam, Husband's sister. Macy was subpoenaed by Husband to testify during the trial. The parties left the courtroom, while the Trial Court and their respective counsel questioned the child regarding her wishes concerning where she was going to live. Matthew testified regarding his Adderall medication and finding Wife at another man's home. He also acknowledged during trial that he had picked Husband's side in the divorce.

During trial, Wife filed a statement listing her necessary monthly expenses at $3,420.00. Wife described these expenses as "bare-bones" that included nothing for entertainment, vacations, or clothing. On the statement, she listed her income at $0. According to Wife, she would be able to "almost meet these expenses" with her social security disability benefits, the minor child's social security benefits, and $1,500 per month. Husband acknowledged that Wife had some significant health issues but testified that "[t]here's no reason why [Wife] can't go get a job or work" and that even with Wife's heart issues, there was nothing written down on paper by a doctor that said she was unable to work.

Husband also introduced a statement that included a list of expenses, which totaled $4,302.97, and stated that he earns a gross income of $5,347.43 per month with a bring-home income of $4,292.50 per month. These expenses included the costs of a truck lease

for the parties' adult son. During cross-examination, Husband acknowledged producing a statement in October 2020 during discovery in which he had provided different values for certain expenses and stated that his expenses had changed. Husband's recent pay stub introduced into evidence included after-tax deductions for, *inter alia*, a 401k loan (which Husband testified was a loan he took out to purchase his Jeep), an automobile lease (which Husband testified was a vehicle for Matthew), and lease insurance.

Husband testified concerning his income. In 2020, Nissan shut down for six weeks, and he was furloughed and received unemployment during that time. Husband confirmed that his unemployment income during that time was not included in his income listed on his pay stub from Nissan. Husband testified that while on unemployment, he had over $300 a week remaining after everything was taken out of the paycheck. Husband agreed during cross-examination that his income for 2020 was down from the previous year. In 2019, he was able to work a lot of overtime, and his 2019 W-2 reflected that he made $93,722.26.

Amy Gilliam, Husband's sister, testified that she received a text message in March 2018 from Wife stating that Wife "couldn't take this anymore," that she was going to die that night from a broken heart, and that she had laid out her children's clothing for the funeral. She tried to contact Wife but was unable to reach her. The next day, Ms. Gilliam found clothing on the kitchen table of the parties' home.

At the conclusion of trial, the Trial Court took the matter under advisement. In December 2020, the Trial Court entered an Opinion and Order, making findings of fact and conclusions of law. The Trial Court found that the parties' divorce was not the fault of only one spouse as both parties had proven actions on the part of the other spouse that could be considered inappropriate marital conduct. The Trial Court found that "[t]he husband's inability to accept the Wife's illness and the financial burden resulting therefrom, the Wife's overnight absences from the marital home and withdrawal from the relationship are all factors, among others, that [led] to the demise of this marriage." The Trial Court then declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129 and distributed the marital assets.

In its Opinion and Order, the Trial Court recognized that Husband's paystub reflected his gross weekly income while employed at Nissan in November 2020 was $1,126.80. Although Husband had deductions for vehicles for him and his adult son and lease insurance deducted from his paycheck, the Trial Court found that Husband could not deduct those expenses from his income. Without those deductions, the Trial Court concluded that Husband's net income is $806.32 per week or approximately $3,400 per month. The Trial Court designated Husband as the primary residential parent with Husband and Wife spending an equal number of days with the minor child. Additionally, the Trial Court directed the parties to prepare a child support worksheet based on Husband's four most recent paystubs without the above deductions from his gross income.

- 5 -

Although Wife was not working, the Trial Court imputed minimum wage to Wife for the purposes of child support calculations because it found there was insufficient proof presented that Wife was "currently totally disabled."

Regarding alimony, the Trial Court found that Wife was "at a significant economic disadvantage," and although there was insufficient evidence to show she was totally disabled, "the seriousness of her medical conditions substantially limits her employment opportunities." The Trial Court considered the parties' respective statements of income and expenses and ordered Husband to pay Wife $1,500 per month in periodic alimony, or alimony *in futuro*.

Following entry of the order, Husband filed a motion to alter or amend the judgment and to stay execution of the judgment, to which Wife responded. While that motion was pending, Wife filed a motion to alter or amend the child support order. Husband filed an affidavit in April 2021, to which he attached four paystubs reflecting the time period from November 3, 2020 to November 29, 2020. Each paystub showed that Husband had earned $1,126.80 each week, with no bonuses or overtime reflected during those pay periods. The paystubs also reflect that sometime in 2020, Husband had earned $1,000 as a "Bonus Lump Sum" and had worked 113.8 hours of overtime, totaling $4,808.62, and 30 hours of double time, which totaled $1,690.20. The bonus and the overtime earnings had not occurred during the four-week period the paystubs encompassed. Husband's most recent paystub reflected that Husband had earned $57,275.21 year to date. Husband also attached his 2020 W-2 to his affidavit, which reflects a total gross income from Nissan of approximately $62,224.98 for 2020.

In May 2021, the Trial Court denied Husband's motion to alter or amend. In June 2021, the Trial Court denied Wife's motion to alter or amend as well. Husband timely appealed to this Court. In September 2021, this Court entered an order determining that the Trial Court's Opinion and Order was not a final judgment resolving all claims between the parties. This Court gave the parties ninety days to obtain a final judgment addressing the remaining claims. The Trial Court subsequently entered a final judgment in December 2021. In this order, the Trial Court ordered, *inter alia*, Husband to pay Wife $537 per month in child support for the minor child, identifying Husband's monthly gross income at $4,878 in the approved permanent parenting plan.

## Discussion

Husband raises the following issues for our review: (1) whether the Trial Court erred by awarding Wife alimony *in futuro* and (2) whether the Trial Court erred by awarding Wife alimony in the amount of $1,500 per month.[2] Wife raises the following additional

---

[2] Husband's second issue refers to alimony *in solido*; however, the Trial Court only ordered Husband to pay "$1,500.00 per month in periodic alimony." The reference to alimony *in solido* appears to be an error.

- 6 -

issue, which we have restated slightly: whether the Trial Court erred by considering only Husband's previous four paystubs when setting his child support obligation. The parties have not raised any issue concerning the Trial Court's award of divorce or its decisions regarding child custody; therefore, we affirm those decisions by the Trial Court.

We first address Wife's issue concerning the calculation of child support. Child support obligations are governed by the Child Support Guidelines, which are promulgated by the Tennessee Department of Human Services in accordance with Tenn. Code Ann. § 36-5-101(e). Due to an element of discretion with child support decisions, we review a trial court's decision concerning child support using an abuse of discretion standard; however, that discretion is hemmed in by the Child Support Guidelines and decisions must be made within the strictures of the guidelines. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). This Court stated as follows regarding child support:

> Under current law, the amount of support derived from a proper application of the formula in the Child Support Guidelines becomes the presumptive amount of child support owed. This amount of support is rebuttable. Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.01(1)(d)(1) (Mar. 2005); *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005). Accordingly, trial courts may, in their discretion, deviate from the amount of support required by the Child Support Guidelines, *State v. Wilson,* 132 S.W.3d 340, 343 (Tenn. 2004); *Jones v. Jones,* 930 S.W.2d at 545, but when they do, they must make specific written findings regarding how the application of the Child Support Guidelines would be unjust or inappropriate in the case. Tenn. Code Ann. § 36-5-101(e)(1)(A); Tenn. Comp. R. & Regs. 1240-2-4-.07(1)(b) (Mar. 2005).

> Because child support decisions retain an element of discretion, we review them using the deferential "abuse of discretion" standard.

*Richardson*, 189 S.W.3d at 725.

Regarding the abuse of discretion standard of review, "[a] court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Fisher v. Hargett*, 604 S.W.3d 381, 395 (Tenn. 2020) (internal quotation marks omitted) (quoting *Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305-06 (Tenn. 2020)). Although child support decisions are reviewed by an abuse of discretion standard, a trial court's discretion is somewhat limited due to its requirement of adhering to the Child Support Guidelines. *Richardson*, 189 S.W.3d at 725.

Wife takes issue with the Trial Court's consideration of only four of Husband's paystubs in calculating child support. In determining a parent's gross income, the trial court shall include, *inter alia*, the parent's wages, salaries, commission, bonuses, overtime payments, and unemployment insurance benefits. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(1). "Variable income such as commissions, bonuses, overtime pay, dividends, etc. shall be averaged over a reasonable period of time consistent with the circumstances of the case and added to a parent's fixed salary or wages to determine gross income." *Id.* -.04(3)(b).

In this case, the Trial Court utilized only the previous four weeks of income in calculating child support despite Husband's history of earning variable income in his current employment. Although Husband had not earned variable income in those four weeks of wages, his most recent paystub reflects that in that year, he had earned $1,000 as a "Bonus Lump Sum," $4,808.62 as 113.8 hours of overtime, and $1,690.20 as 30 hours of double time. None of the foregoing variable income was considered by the Trial Court in calculating Husband's income. For the previous year, Husband's W-2 reflects that Husband earned $93,722.26. The child support guidelines require the trial court to calculate variable income for a "reasonable period of time." As to what amount of time is considered reasonable, this Court has stated:

> Regarding whether a certain period of time is "reasonable," one commentator notes, "There is no guidance as to the time frame over which the income should be averaged," adding "[i]f possible, figures should be considered for *at least* one year, particularly where the variations are seasonal in nature." JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 10–7(c) (2d ed.2004) (emphasis added). Furthermore, Tennessee courts have displayed "a preference for long-term averaging as the most appropriate method for calculating income that is variable in nature." *Anderson v. Anderson,* No. M2004-00078-COA-R3-CV, 2005 WL 2030614, *3 (Tenn. Ct. App. Aug. 23, 2005) (citations omitted) (remanding the case to the trial court for a redetermination of child support based on husband's average income over a long term period)[.]

*Burnett v. Burnett*, No. W2007-00038-COA-R3-CV, 2008 WL 727579, at *11 (Tenn. Ct. App. Mar. 19, 2008) (other internal citations omitted).

We hold that four weeks is not a reasonable period of time when the parent has earned variable income regularly throughout his or her career. This Court has expressed a preference for the consideration of averaging long-term variable income when calculating a parent's income for child support purposes. We determine that the Trial Court has abused its discretion by applying an incorrect legal standard in its calculation of Husband's income by considering only four weeks of Husband's salary or wages as reflected on his paystubs while ignoring Husband's variable income history over a longer period of time. This

calculation based on four weeks of income is not a reasonable period of time as required by the Child Support Guidelines. As such, we vacate the Trial Court's ruling regarding child support and remand for recalculation of child support based on Husband's income including any variable income averaged over a long-term "reasonable period of time" to properly reflect Husband's income.

We next address Husband's issues concerning the Trial Court's award to Wife of alimony *in futuro*. As our Supreme Court has observed, trial courts have broad discretion "to determine whether spousal support is needed and, if so, the nature, amount, and duration of the award." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). Alimony determinations are fact-driven and require a balance of many factors, and we do not tinker with a trial court's decision in this area absent an abuse of discretion. *Id*. In Tennessee, there are four distinct types of alimony: (1) alimony *in futuro*, (2) alimony *in solido*, (3) rehabilitative alimony, and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d)(1). Tennessee law favors rehabilitative alimony and transitional alimony over alimony *in futuro* and alimony *in solido* when possible. Tenn. Code Ann. § 36-5-121(d); *Mayfield v. Mayfield*, 395 S.W.3d 108, 115 (Tenn. 2012). Rehabilitative alimony aids an economically-disadvantaged spouse, allowing him or her to obtain the capacity for self-sufficiency after the divorce. *Id*. Rehabilitation is statutorily defined as allowing a spouse to "achieve, with reasonable effort, an earning capacity that will permit the economically disadvantaged spouse's standard of living after the divorce to be reasonably comparable to the standard of living enjoyed during the marriage, or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." Tenn. Code Ann. § 36-5-121(e)(1) (2021). Transitional alimony is appropriate when a court finds rehabilitation is unnecessary but the economically-disadvantaged spouse requires financial assistance adjusting to the economic consequences of divorce. *Mayfield*, 395 S.W.3d at 115. Alimony *in futuro*, also known as periodic alimony, is a long-term form of alimony and is appropriate when rehabilitation of the economically-disadvantaged spouse is not feasible. Tenn. Code Ann. § 36-5-121(f)(1) (2021).

In determining whether to award alimony and, if so, its nature, amount, length, and manner of payment, courts consider the following statutory factors:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;

- 9 -

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2021). "The two most important factors a trial court must consider are the need of the disadvantaged spouse and the obligor spouse's ability to pay." *Mimms v. Mimms*, 234 S.W.3d 634, 638 (Tenn. Ct. App. 2007) (citing *Bratton v. Bratton,* 136 S.W.3d 595, 604 (Tenn. 2004)).

Husband argues on appeal that the Trial Court erred by awarding Wife alimony *in futuro*. Husband challenges any award of alimony to Wife but argues that if alimony is allowed, an award of transitional alimony or rehabilitative alimony would be more appropriate. As stated above, the determination of spousal support was a discretionary one for the Trial Court.

The Trial Court made several findings of fact relevant to the above factors. The parties were married for twenty-one years and had two children during the marriage, one of which was a minor at the time of trial. The Trial Court significantly emphasized Wife's health conditions when making its award of alimony. Prior to the deterioration of Wife's health, she worked as a medical assistant and certified x-ray technologist. Wife testified that she is unable to work in those positions anymore because of her heart condition. Wife had developed serious heart issues that caused loss of consciousness when standing for periods of time. According to Wife, she had "black[ed] out" a couple times a month due to the pooling of blood in her lower extremities when standing. She also had been diagnosed with anxiety, depression, bipolar disorder, and attention deficit disorder, for which she took medication. She had not been employed after having an episode with her heart while at work in 2016. The parties' adult son testified about an episode where he was forced to perform CPR on Wife. Although not determining Wife was completely disabled,

the Trial Court found that Wife's employment opportunities were extremely limited due to the seriousness of her medical conditions.

Wife had social security disability income at one point, but the Trial Court found that Wife's social security benefits were "inexplicably" discontinued. The Trial Court further found that an individual identifying himself or herself as the payee on the account contacted the Social Security Administration (SSA) telling them that Wife was no longer disabled. Wife testified that Husband was listed as the payee on the account due to her mental health issues and was allowed to communicate with the SSA. The Trial Court did not make a finding as to the identity of the individual communicating with the SSA. The notice informing of the cancellation of Wife's benefits was sent to Husband at the marital address where Husband was residing. Wife resided elsewhere. The Trial Court found that the notice was left with Wife's mail in the kitchen of the marital home. Although Wife is actively trying to reinstate her social security benefits, she had no income at the time of trial other than the $400 of support Husband had been paying during the divorce proceedings.

The Trial Court found that Husband had "problems" dealing with Wife's health condition and subjected Wife to verbal abuse on the issue, telling her to "'go mooch off someone else'" and that "she is not sick and should get a job." Despite the cost to Husband of only $20 per week to maintain health insurance for Wife, the Trial Court found that Husband cancelled her health insurance in anticipation of the parties' upcoming divorce. As a result, Wife testified that she had not been able to see her heart doctor at Vanderbilt because of the cancelled insurance. Although Husband later attempted to obtain a replacement insurance policy, Wife testified that the new policy was not equivalent to the previous policy and that she could not afford the deductibles or other expenses. Due to Wife's lack of insurance and limited medical visits, the majority of evidence regarding Wife's health condition was from her testimony. Wife testified that her condition had not improved over the past year and that the episodes of her passing out and her blood pressure bottoming out had gotten worse.

It is clear that Husband disagrees with the Trial Court's decision to award Wife alimony *in futuro*. According to Husband, the evidence does not support a finding that Wife could not be rehabilitated and relies on the Trial Court's finding that there was insufficient proof that Wife was "totally disabled." A finding that Wife was "totally disabled" was not required for the Trial Court to award Wife alimony *in futuro*. In fact, the amount of alimony awarded to Wife was enough to cover only part of Wife's monthly expenses as she still was seeking reinstatement of her disability benefits. Wife testified that her heart condition was not improving but had gotten worse over the past year before trial. Wife's heart condition was such that she was unable to perform many jobs, including the employment she had maintained in the past. The Trial Court found that Wife's employment opportunities were extremely limited due to her health condition. The evidence does not preponderate against any of the Trial Court's findings. Based upon

- 11 -

Wife's health condition and her limited employment opportunities, we determine that the Trial Court did not abuse its discretion in determining that alimony *in futuro* was appropriate in this case instead of rehabilitative alimony or transitional alimony.

We note that Husband also has raised an issue on appeal regarding the amount of alimony awarded. Because we have vacated the Trial Court's award of child support and remanded for recalculation, we also vacate the amount of alimony ordered by the Trial Court. "Child support decisions should precede decisions about spousal support because a spouse's ability to pay spousal support may be directly and significantly influenced by the amount of child support he or she has been ordered to pay." *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998); *see also Bolt v. Bolt*, No. E2017-02357-COA-R3-CV, 2018 WL 5619733, at *6-7 (Tenn. Ct. App. Oct. 30, 2018). As child support has an effect on Husband's ability to pay, we remand for the Trial Court to reconsider the amount of alimony after its recalculation of his child support obligation.

### Conclusion

Based on the foregoing, we affirm the Trial Court's judgment regarding the award of divorce, child custody, and its determination that alimony *in futuro* is appropriate in this case. However, we vacate the Trial Court's judgment awarding child support and remand for recalculation of child support as consistent with this Opinion. We further vacate the amount of alimony awarded to Wife to be reconsidered by the Trial Court upon remand after recalculating Husband's child support obligation. Costs on appeal are assessed to the appellant, Brad Joseph Marcel, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE