IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 12, 2014 Session

## BONNY BROWNE v. ALEXANDER LEE BROWNE, JR.

**Appeal from the Circuit Court for Hamilton County**
**No. 10D241      Jacqueline S. Bolton, Judge**

_____

**No. E2013-01706-COA-R3-CV - Filed August 27, 2014**

_____

In this divorce action, Wife appeals the trial court's valuation of Husband's ownership interest in three businesses, determination of Husband's income, division of marital assets, duration of rehabilitative alimony awarded to her, amount of child support Husband was ordered to pay, and the amount of attorney's fees awarded to her. We determine that the trial court accepted the calculation of a $134,085.00 promissory note as a liability for one business co-owned by Husband but failed to require value of the same amount as a note receivable for the business collecting payment on the debt, owned 50% by Husband. We therefore increase the trial court's valuation of the business collecting payment on the debt by one-half the amount of the applicable note receivable, or $67,042.50. We also determine that the trial court erred by attributing to Husband the full liability for the third business, a limited liability company in which Husband owns a one-half interest. We accordingly reduce the allocation for that liability by one-half, or $45,689.50, increasing the total modification of the value of Husband's net assets awarded by the trial court by the amount of $112,732.00. We award to Wife 48% of this increase, or $54,111.36, commensurate with what we determine to be the trial court's equitable distribution of marital property, and we remand for a determination regarding the proper method of distribution for this additional award to Wife. We affirm the trial court's judgment in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

John P. Konvalinka and Jillyn M. O'Shaughnessy, Chattanooga, Tennessee, for the appellant, Bonny Browne.

Jennifer H. Lawrence and David H. Lawrence, Chattanooga, Tennessee, for the appellee, Alexander Lee Browne, Jr.

**OPINION**

I. Factual and Procedural Background

The parties were married in 1994 and had been married eighteen years at the time of entry of the divorce decree. Their marriage produced two children: a daughter who was thirteen years old at time of trial and a son who was seven years old ("the Children"). At the time of the divorce, both parties were in good physical and mental health. Husband was forty-seven years old, and Wife was forty.

Husband was president of Browne Laboratories, Inc. ("Browne Labs"), a chemical treatment company in which he also held a 44.837% ownership interest. His business partner, Dean Norwood, owned an approximately equal interest in Browne Labs. The remaining interest in the company was held by Husband's father, who, pursuant to a 2003 stock option agreement, had been selling his company shares equally to Husband and Mr. Norwood on a monthly basis. Husband's undisputed base income from Browne Labs in 2011, the year preceding trial, was $310,339.00. Husband was also a 50% partner in South Creek, LLC ("South Creek"), a company that owned the real property on which Browne Labs was located. On a personal financial statement admitted into evidence, Husband listed his 2011 income from South Creek as $37,244.00. He was a partner in a third business as well, an ice machine business known as Ice Ice Baby, LLC ("Ice Baby"), which listed an overall loss for tax purposes in 2011 of $3,774.00.

Wife had not been employed outside the home since the birth of the parties' first child in 1998. She completed a bachelor's degree in education in 1996, two years into the marriage, but she did not obtain a teaching license or seek employment as a teacher. Prior to her first child's birth, Wife worked as a child care provider and for approximately one year as a bookkeeper at Browne Labs. According to Wife's social security earnings statement, she earned the highest amount for any one-year period during the marriage in 1997 when she received $21,694.00 while working at Browne Labs.

On January 28, 2010, Wife filed a complaint for divorce, alleging irreconcilable differences or, in the alternative, inappropriate marital conduct on Husband's part. Wife alleged that Husband had physically and verbally abused her. She requested, *inter alia*, a temporary restraining order, which the trial court immediately granted, enjoining Husband from contacting Wife or coming about the marital residence. Wife concomitantly filed a motion requesting spousal support, child support, and attorney's fees.

On July 21, 2010, Husband filed an answer and counterclaim in which he admitted irreconcilable differences, denied Wife's allegations of inappropriate martial conduct on his part, averred inappropriate marital conduct on Wife's part, and requested that he be named the primary residential parent. On August 4, 2010, the parties reached a limited mediated agreement as to co-parenting issues, including agreed modification of the temporary restraining order to allow communication between the parties regarding the Children and both parents' simultaneous attendance at the Children's school activities.

Wife filed a second motion for temporary support on November 11, 2010, in which she alleged that Husband had "closed and/or removed [Wife's] access to all of the parties' joint banking accounts in violation of the Court's injunction." *See* Tenn. Code Ann. § 36-4-106(d)(1) (2014) (enjoining both parties in a pending divorce action from "transferring, assigning, borrowing against, concealing or in any way dissipating or disposing, without the consent of the other party or an order of the court, of any marital property."). Testimony and financial records presented at trial demonstrated that Husband paid Wife a total of $7,400.00 in combined spousal and child support between January 2010 and January 2011. Upon an agreement between the parties, Husband began in January 2011 to pay Wife $500.00 weekly in combined spousal and child support and did so through the time of trial. It is undisputed that Husband continued to pay the mortgage and utilities on the marital residence throughout the pendency of the divorce proceedings.

Trial, initially set for April 2011, was continued several times. The parties eventually entered into an agreed permanent parenting plan, which the trial court approved on April 16, 2012. Pursuant to the permanent parenting plan, the parties equally shared co-parenting time, with the Children residing alternate weeks with each parent. The issue of child support was reserved for trial.

Following a bench trial conducted over three days on September 5, September 6, and October 16, 2012, the trial court entered a Preliminary Opinion regarding the valuation of Browne Labs on January 25, 2013. The court subsequently entered an Order granting both parties a divorce on stipulated grounds on January 29, 2013. Based on the trial court's Preliminary Opinion, Husband filed a revised valuation calculation for Browne Labs on March 7, 2013. On March 20, 2013, the court entered its Memorandum Opinion and Order, incorporating the revised valuation of Husband's interest in Browne Labs into its delineation of what it determined to be an equitable distribution of the marital property. The court ordered Husband to pay Wife $6,500.00 monthly in rehabilitative alimony for seven years. The trial court also directed that it would further consider Wife's request for attorney's fees. Wife subsequently filed an affidavit claiming a total of $94,387.87 in attorney's fees and expenses.

On April 11, 2013, Husband filed a motion to alter or amend the judgment. Upon reconsideration of the evidence presented at trial, the trial court on April 30, 2012, entered an Order reducing the duration of Wife's rehabilitative alimony from seven to five years. Upon consideration of Wife's affidavit, the court awarded Wife $45,000.00 of her attorney's fees and expenses as alimony *in solido*. On June 24, 2013, the court entered a Final Decree, establishing Father's child support obligation to be $2,723.00 monthly. Wife filed a motion to alter or amend the judgment on July 11, 2013, and a premature notice of appeal on July 24, 2013. The trial court subsequently entered an order denying Wife's motion to alter or amend on August 27, 2013. At this point, Wife's premature notice of appeal became timely. *See* Tenn. R. App. P. 4(d) ("A prematurely filed notice of appeal shall be treated as filed after the entry of the judgment from which the appeal is taken and on the day thereof.").

## II. Issues Presented

Wife presents eight issues on appeal, which we have restated as follows:

1.      Whether the trial court erred in its valuation of Husband's ownership interest in Browne Laboratories, Inc.

2.      Whether the trial court erred in its valuation of Husband's ownership interest in South Creek, LLC.

3.      Whether the trial court erred in its valuation of Husband's ownership interest in Ice Ice Baby, LLC.

4.      Whether the trial court erred by failing to find a dissipation of marital assets against Husband.

5.      Whether the trial court erred by awarding a greater portion of net marital assets to Husband.

6.      Whether the trial court erred by reducing the duration of its award to Wife of rehabilitative alimony from seven to five years upon Husband's motion to alter or amend the judgment.

7.      Whether the trial court erred in its determination of Husband's income for the purposes of setting his child support obligation.

8.      Whether the trial court erred by awarding Wife $45,000.00 in attorney's fees and expenses as alimony *in solido* rather than her requested amount of $94,387.87.

## III. Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. §36-4-121(c)

-5-

outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of either party. An equitable division of marital property is not necessarily an equal division, and §36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140 at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

Determinations regarding spousal and child support are reviewed under an abuse of discretion standard. *See Mayfield v. Mayfield*, 395 S.W.3d 108, 114-15 (Tenn. 2012); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). "This standard requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

IV. Valuation of Husband's Ownership Interest in Businesses

Wife contends that the trial court erred by valuing Husband's ownership interest in all three businesses–Browne Labs, South Creek, and Ice Baby, respectively–at amounts below those proffered by Wife. Husband contends that the trial court properly considered all of the valuation evidence presented, including the expert witnesses' testimony regarding the value of Browne Labs, and did not err in calculating the value of the businesses. We will address the trial court's valuation of Husband's interest in each business in turn.

As this Court has previously explained:

The value of marital property is a fact question. Thus, a trial court's decision with regard to the value of a marital asset will be given great weight on appeal. In accordance with Tenn. R. App. P. 13(d), the trial court's decisions with regard to the valuation and distribution of marital property will be presumed to be correct unless the evidence preponderates otherwise.

The value of a marital asset is determined by considering all relevant evidence regarding value. The burden is on the parties to produce competent evidence of value, and the parties are bound by the evidence they present.

-6-

Thus the trial court, in its discretion, is free to place a value on a marital asset that is within the range of the evidence submitted.

*Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987) (internal citations omitted).

## A. Browne Laboratories, Inc.

As to the valuation of Husband's ownership interest in Browne Labs, Wife primarily asserts that the trial court erred in its determination that the capitalization rate determined by her valuation expert, Shannon Welsh Farr with Decosimo Advisory Services, should be applied to the cash flow analysis determined by Husband's valuation expert, Randall Benjamin Hebert with Henderson Hutcherson & McCullough, PLLC. Wife disputes Mr. Hebert's application of a minority interest discount for Husband's share in the company, and she maintains that the court should have considered the stock option price paid by Husband and Mr. Norwood as indicative of the value of Husband's shares. In total, Ms. Farr valued Husband's share of Browne Labs at $863,112.00, and Mr. Hebert valued it at $146,190.00. The trial court ultimately valued Husband's share of Browne Labs at $277,000.00. Husband asserts that the trial court properly assigned a valuation that was within the range of expert testimony and was supported by the evidence. *See Powell v. Powell*, 124 S.W.3d 100, 103 (Tenn. Ct. App. 2003) ("If the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence."). We agree with Husband on this issue.

As the trial court specifically found, Browne Labs is a closely held corporation in which Husband held a 44.837% ownership interest at the time of trial. Both valuation experts applied a capitalization of cash flows method when valuing Husband's share of Browne Labs, which as Ms. Farr noted in her report, is a method within the income approach used by business valuators. In considering the price paid by Husband and Mr. Norwood for their stock shares, Ms. Farr also applied a transactions method, used within a market approach to determine the market value of Husband's shares if he were to sell them. In support of her position that the trial court erred in giving greater weight to Mr. Hebert's valuation, Wife relies on our Supreme Court's adoption of the "Delaware Rule," requiring that the three methods of (1) market value, (2) asset value, and (3) investment or earnings value be used together "in determining the fair value of a dissenter's shares" in a closely held corporation. *See Blasingame v. American Materials, Inc.*, 654 S.W.2d 659, 666 (Tenn. 1983), *superseded by statute on other grounds as stated in Wakefield v. Crowley*, 6 S.W.3d 442 (Tenn. 1999). However, as this Court has explained, although "the Tennessee Supreme Court has held that the 'Delaware Rule' must be used to determine the value of a dissenting minority shareholder's shares, it has not decreed that the 'Delaware Rule' is the only

acceptable way to arrive at the value of the parties' interest in a closely held corporation in a divorce proceeding." *Wallace*, 733 S.W.2d at 197.

As this Court further explained in *Wallace*:

There are a number of acceptable methods available to determine the value of a corporation. *Blasingame*, [654 S.W.2d at 666] recognized three of these methods: (1) the market value method, (2) the asset value method, and (3) the earnings value or capitalization of earnings method. There are still others including the dividend method and the liquidating value method. The choice of the proper method or combination of methods depends upon the unique circumstances of each corporation.

A public corporation's value is most reliably determined using the market value method. *Blasingame*, [654 S.W.2d at 666]. This method presumes that there is an established market for the corporation's stock which will enable the court to arrive at the price a willing buyer would pay for the stock. The stock in closely held corporations is rarely traded. Thus, it is improper to attempt to place a value of a closely held corporation using the method generally used to place a value on a public corporation.

Determining the value of a closely held corporation is not an exact science. The courts have not articulated a consistent approach to the valuation of this type of marital asset. However, Rev. Rul. 59-60, 1959-1 C.B. 237 has been recognized as providing the most comprehensive guide to making this determination. But Rev. Rul. 59-60 is intended to be only a guide. It was never intended to be an inflexible rule.

Rev. Rul. 59-60 contains nine factors which should be considered when determining a closely held corporation's value. These factors include:

(1) the nature of the business, including its history since organization,

(2) the economic status of the industry and the nation at the critical date of valuation,

(3) book value,

(4) earnings,

(5)     dividends and dividend paying capacity,

(6)     the existence or lack of good will or other intangible value,

(7)     sales of the stock and the size of the block to be valued,

(8)     the selling price of comparable securities relative to their earnings, dividends and asset values,

(9)     the life insurance proceeds received by a corporate beneficiary on a policy covering the sole or controlling stockholder.

*Wallace*, 733 S.W.2d at 107-08 (additional internal citations omitted). We note that Mr. Hebert's valuation report specifically references consideration of the factors delineated in Revenue Ruling 59-60, and our review of Ms. Farr's valuation report reveals her consideration of comparable factors. Both experts explained in their reports and in testimony that the asset approach, which essentially subtracts the value of liabilities from the value of assets, was not a viable approach for valuing Husband's interest in Browne Labs because Husband does not have the ability to unilaterally liquidate assets.

In its Preliminary Opinion regarding the valuation of Husband's ownership interest in Browne Labs, the trial court stated in pertinent part:

The Court has reviewed the testimony and the proffered evaluations [compiled] by the parties' expert witnesses. The Court relies heavily on the valuations based on capitalization of the corporation's cash flow.

Wife's expert, [Shannon] Farr, opines that the value of the Husband's share of the corporation is $864,112.00.[1] Farr's valuation is actually based on capitalization of cash flow and transactions analysis, but there is only a slight reduction in the value of Husband's shares because of the averaging of both methods. Husband's expert, Randall Hebert, opines that the value of Husband's shares using the capitalization of cash flow method is, as the amended report states, $146,000.00.

---

[1]Ms. Farr's valuation of Husband's interest was in the amount of $863,112.00, rather than $864, 112.00, apparently a typographical error, which the trial court corrected in its Memorandum Opinion and Order.

The experts testify that the difference in the two reports is the methodology of cash flow chosen, capitalization rate, minority and marketability discounts and deductions for capital expenditures.

The Court is persuaded that the capitalization of cash flow method of the Hebert [valuation] is the appropriate method to use. The Court finds Farr's capitalization rate is the most reasonable rate to apply to Hebert's cash flow analysis. The Court also agrees [that] Hebert's minority and marketability discounts, as well as capital expenditures, deductions should be applied and deducted from the final valuation of Husband's interest.

The Court would like to see the "final number" after the calculations are made before completing the entire opinion in this case.

Husband subsequently filed a "Notice of Defendant's Revised Valuation Utilizing Court's Preliminary Order," which included the following chart demonstrating the recalculated valuation of Husband's ownership interest in Browne Labs:

Capitalized Value

| | |
|---|---|
| Ongoing Cash Flow to Invested Capital for Next Year | 195,407 |
| Capitalization Multiple | 8.18 |
| Indicated Capitalized Value of Invested Capital | 1,598,429 |
| Less: Interest Bearing Debt | (199,490) |
| Indicated Capitalized Value of Equity (Controlling, Marketable) | 1,398,939 |
| Less: One-Time Capital Expenditures | (255,000) |
| Indicated Capitalized Value of Equity After One-Time Capital Expenditures (Controlling, Marketable) | 1,143,939 |
| Less: Minority Interest Discount                           25% | (285,985) |
| Indicated Capitalized Value of Equity (Minority, Marketable) | 857,954 |
| Less: Marketability Discount                           28% | (240,227) |
| Indicated Capitalized Value of Equity (Minority, Non-Marketable) | 617,727 |
| Total Number of Shares Outstanding | 184 |
| Per Share Value | 3,357 |
| Number of Shares Being Valued | 82.5 |
| Calculated Interest Value (rounded) | $ 277,000 |

In its Memorandum Opinion and Order, the trial court adopted the recalculated valuation and expressed the following specific findings of fact and conclusions of law in pertinent part:

Husband has a 44.837% interest in Browne Labs. Husband's business partner is Dean Norwood, who also has a 44.837% share in Browne Labs. Browne Labs is a closely held corporation which was begun many years ago by the father of Husband, Alexander Lee Browne, Sr. (Senior)[.] Both the now existing partners have been purchasing stock options from Senior each at $13,000.00 per month. Though the stock option plan is voluntary, Husband testified that the buy-out was a "take it or leave it" situation from Senior. That issue is almost moot because as of April 2013, the buy-out shall be totally [paid] to Senior.

The crux of the valuation differences between the experts hired by the parties, is of course the valuation placed upon the labs by each expert and the methodology used to arrive at that value. Wife's expert used the controlling interest test in valuating the business, where Husband's expert [differed in] whether Husband and Dean are majority or minority owners of the lab. Wife's expert valued the two as majority owners and Husband's expert valued the business based upon minority interest holders. The two values come out substantially different. Husband's valuation is $186,533.00 for his interest.[2] Wife's position is that the lab is worth $863,112.00.

An analysis of the two valuations indicates the differences between the two reports to be cash flow chosen, the applicable capitalization rate, the minority interest and marketability discount, deductions for capital expenditures necessary for storage space, which would be necessary before the business is sold. These differences account for the large swing between the two values. Husband's expert values each share at $2,261.00 where Wife's expert values each share at $10,461.00. Husband's expert concludes that the purchase of 1.25 shares for $13,000.00 from Senior, is a gross over-valuation of the stock.

Because this is a closely held corporation and Senior enjoys the fruit of operating in a vacuum no where close to an arm's length transaction, the conclusion by the expert that $13,000.00 for 1.25 shares is a gross over-valuation is probably accurate. The Court is also concerned that the Wife's

[2] Mr. Hebert's actual appraisal was $146,190.00, which was rounded to $146,000.00 by the trial court in its Preliminary Opinion. The figure noted here of $186,533.00 was the valuation proffered by Mr. Hebert in his original report, but prior to trial, he amended his report to correct an error and submitted the lower valuation. He testified that in the original valuation, "other expense" from the historical financial statements had been inadvertently applied as income instead of an expense and carried throughout the calculations.

expert valued the equity on a controlling interest basis. The Court does not believe that a 44.837% interest in a corporation amounts to a controlling interest, especially when the co-partner has exactly the same ownership interest.

On January 25, 2013, the Court entered a "Preliminary Opinion" delineating the Court's reasoning as to the valuation of Browne Labs and requested a recalculation of Browne Labs based on the Court's analysis. The result of the recalculation is a value of $277,000.00.

The trial court proceeded in its Memorandum Opinion and Order to value Husband's ownership share of Browne Labs at $277,000.00 when dividing the marital property. Wife does not dispute on appeal that Husband's counsel correctly followed the court's instructions in recalculating the value of Husband's ownership interest.

Both experts appraised Husband's interest in Browne Labs effective December 31, 2011, the end of the last calendar year before trial began. The capitalization of cash flows method, used by both experts and relied upon by the trial court, was defined by Ms. Farr in her report as follows:

The capitalization of cash flows method is a method within the income approach that capitalizes a single period estimate of ongoing cash flows. The required inputs for this method include an estimate of ongoing cash flows and a capitalization rate (or factor).

Similarly, Mr. Hebert in his report labels his method the "Capitalization of Earnings Method" and defines it as follows:

[A] method within the income approach whereby economic benefits for a representative single period are converted to value through division by a capitalization rate.

Mr. Hebert defines "Capitalization Rate" as "any divisor (usually expressed as a percentage) used to convert anticipated economic benefits of a single period into value."

Two key differences between the experts' application of the capitalization of cash flows method were that they chose different time periods for their single-period estimates and that they arrived at different capitalization rates. Ms. Farr analyzed the latest (most recent) twelve months ("LTM") while Mr. Hebert analyzed the five-year period from 2007 through 2011, removing the two highest earning years of 2009 and 2010. Although the trial court

ultimately adopted Mr. Hebert's capitalization of cash flow calculation, Husband questions Ms. Farr's use of the LTM, noting our Supreme Court's holding in *Blasingame* that for the purpose of determining a dissenting stockholder's share, "any valuation of [a corporation's] earnings that does not take into consideration a minimum of three years corporate earnings experience should be rejected, unless the expert opinion clearly and convincingly establishes the validity of a lesser period." *See* 654 S.W.2d at 665. We note that the purpose of the valuation in the instant action is distinguishable from that in *Blasingame* and that Ms. Farr explained her rationale for choosing the LTM time period in detail.

In part due to the difference in time periods analyzed, Ms. Farr determined the estimate of ongoing cash flow to invested capital for Browne Labs to be $256,626.00, and Mr. Hebert estimated it to be $195,407.00. Ms. Farr determined the total equity rate to be 17.81% and used this equity rate to calculate a capitalization rate of 12.23%, which provided a capitalization multiple of 8.18. Mr. Hebert determined the total equity rate to be 25.27% and used this equity rate to calculate a capitalization rate of 18.46%, providing a capitalization multiple of 5.42. When, upon the trial court's instruction, Ms. Farr's capitalization rate was applied to Mr. Hebert's capitalization of cash flow, the resultant valuation of Husband's ownership interest was higher ($277,000.00) than Mr. Hebert's valuation ($146,190.00) but still much lower than Ms. Farr's valuation ($863,112.00).

Both experts testified that they derived their respective capitalization rates from a "build-up analysis" consisting of several components. Mr. Hebert explained the beginning of this process and at what point the two experts began to differ:

> We start here with our capitalization rate. We start with our risk-free rate, and I won't belabor that, it's identical to what's used in the Decosimo [Farr] report, 2.57. The equity risk premium, again, I believe we used the same source for that information, won't belabor that, it was 6.14. First departure that we have relative to that and the size risk premium that we applied to this particular valuation comes from the same source, but we used a different bound market capitalization than what was used in the Farr report, and the number that we selected was 11.77 percent based on the recommendation from Morningstar.

According to both experts, Morningstar, the source for both experts' choice of bound market capitalization, augmented its information in 2010 to break its former categories into subcategories and consider smaller bounds of market capitalization. Ms. Farr described this choice of category as adding a "small stock risk premium" for investments in smaller companies. She selected what she described as "the tenth decile, also known as the "10b" category, and did so "primarily because it does include a large number of companies." Ms.

Farr explained that in 2010, Morningstar divided 10b into subcategories "10x" and "10z." Subcategory "10z" includes the smallest companies within the tenth decile. Referencing her reading of a treatise recognized by business valuators, Ms. Farr opined that it may not be necessary to use the 10z subcategory when valuing a small company because the companies within 10z may be riskier than the company being valued. Mr. Hebert disagreed with this point and testified that he chose the 10z category because he opined that it was designed for companies such as Browne Labs, which he characterized as "the smallest of the small." The resultant difference in the small stock risk premium chosen was that Ms. Farr applied a premium of 6.1% while Mr. Hebert applied a premium of 11.77%, contributing significantly to the difference in the two experts' respective calculations of capitalization rate.

The trial court's specific findings in both its Preliminary Opinion and Memorandum Opinion and Order demonstrate the court's thorough consideration of both experts' reports and testimony. The trial court accepted Ms. Farr's capitalization rate as the most appropriate, and the court directed that this capitalization rate be applied to Mr. Hebert's cash flow analysis. *See generally Keyt*, 244 S.W.3d at 327 (noting that upon review of the trial court's decisions regarding marital property, we afford great deference to the trial court's evaluation of the weight and credibility given to witnesses' testimony).

The trial court also expressed concern in its Memorandum Opinion and Order that Ms. Farr had valued Husband's ownership interest in Browne Labs on a controlling interest basis. Upon our thorough review of the record, we find the trial court's concern to be supported by the evidence. Wife asserts that although Ms. Farr testified that she characterized Husband's interest in Browne Labs as controlling, she did not actually apply a control premium in calculating her valuation. She argues that Mr. Hebert erred by applying a 25% minority discount rate because a minority interest is assumed in a capitalization of cash flow method. Mr. Hebert's testimony demonstrated, however, that he purposefully chose to apply a 25% minority discount rate within the capitalization of cash flow method. Moreover, Ms. Farr testified that valuation experts differ on this point, stating: "[M]any believe apples to apples that you should make controlling or normalizing adjustments to the cash flows and then also use the discount rate, which is based on the build-up method and that that would result in a–could result in a control or a marketable minority interest."

It is undisputed that Husband's 44.837% ownership interest in Browne Labs is not a controlling interest on its face because it does represent less than a 51% share in the business. In characterizing Husband's interest as controlling, Ms. Farr testified that she considered Husband's role as an equal decision-maker with Mr. Norwood and the provision, included in the 2003 stock option agreement, that Husband would eventually inherit any share in the company still held by his father at his father's death. Husband testified that he and Mr. Norwood equally shared nearly all decision-making responsibilities for Browne Labs and that

Husband's father no longer took an active role in running the business. According to Husband's and both experts' testimony, Husband's and Mr. Norwood's responsibilities for the company differed widely, with Mr. Norwood acting in a technical and hiring capacity and Husband in performing marketing and sales. When questioned regarding why his title was president and Mr. Norwood's was vice-president, Husband stated that Mr. Norwood did not desire to be president. Husband confirmed that he did not possess unilateral authority to liquidate any part of Browne Labs.

The trial court in its Memorandum Opinion and Order rejected the proposition that Husband's shares in Browne Labs should be valued according to the price he and Mr. Norwood had been paying to Husband's father. Pursuant to the stock option agreement, Husband and Mr. Norwood had been purchasing shares of stock in Browne Labs from Husband's father for $13,000 per 1.25 shares on a monthly basis since at least as early as the agreement's inception in 2003. Testimony demonstrated that Husband and Mr. Norwood had opted not to purchase stock from Husband's father for only a month or two in 2006, but they had otherwise consistently exercised their option. Provided that they continued exercising the option, Husband and Mr. Norwood were scheduled to have acquired all of Husband's father's stock by the end of April 2013.

In her valuation, Ms. Farr considered the stock option agreement when she applied the transactions method. Mr. Hebert rejected the transactions method as inapplicable to Browne Labs. In her valuation report, Ms. Farr defines the transactions method as follows:

> The transactions method is a method within the market approach that develops an indication of value based upon actual transactions that have occurred in the stock of the subject company. Transactions are reviewed to determine if they have occurred at arms' length, with a reasonable degree of frequency, and within a reasonable time period relative to the valuation date.

Accordingly, Ms. Farr calculated that the purchase price of $13,000.00 per 1.25 shares translated to a value of $10,400.00 for each share. Her report and testimony demonstrate that this calculation did not raise her determination of value in the company's overall equity because she actually found that equity to be less using the transactions method and ultimately averaged the two figures together. Wife does use Ms. Farr's transactions method calculations, however, to assert that the value of $10,400.00 per stock share is within the range of Ms. Farr's estimate of Husband's ownership interest and far below Mr. Hebert's estimate.

Mr. Hebert testified that in deciding not to apply the transactions method, he concluded that the purchase price set forth in the stock option agreement "grossly over-

valued the company." Husband testified that when he and Mr. Norwood entered into the stock option agreement, Husband's father was ready to leave the day-to-day operations of Browne Labs and set a "take it or leave it" price for his shares, based on the amount Husband's father believed he needed to obtain. No evidence was presented to indicate that a buyer other than Husband and Mr. Norwood had expressed willingness to pay $10,400.00 per stock share. The trial court specifically found in its Memorandum Opinion and Order that "[b]ecause this is a closely held corporation and Senior [Husband's father] enjoys the fruit of operating in a vacuum no where close to an arm's length transaction, the conclusion by the expert [Mr. Hebert] that $13,000.00 for 1.25 shares is a gross over-valuation is probably accurate." The evidence does not preponderate against this finding.

Wife raises two additional points of error challenging Mr. Hebert's valuation of Browne Labs. She asserts that (1) Mr. Hebert applied a deduction for capital expenditures that were not disclosed in response to Ms. Farr's inquiries and that were not set to take place until after the valuation period ended on December 31, 2011, and (2) that Mr. Hebert's valuation failed to meet a test of reasonableness to which both experts agreed. When the trial court, in its Memorandum Opinion and Order, adopted the valuation recalculated by Husband, it accepted Mr. Hebert's deduction of $255,000.00 for capital expenditures. Mr. Hebert testified that Browne Labs was in the process of incurring several capital expenditures, including building a mezzanine needed as storage space for raw materials. He opined that because expenses such as constructing the mezzanine would be necessary before the business could be sold, the expenditures should be deducted. Mr. Hebert stated that he learned of the capital expenditures in progress through his June 2012 interview with Mr. Norwood prior to submitting his report in August 2012. Ms. Farr testified that she had not received any information regarding capital expenditures and had not deducted any from her valuation. In its Memorandum Opinion and Order, the trial court specifically noted the deduction for capital expenditures as a difference between the two expert valuations and as a valid consideration.

As to the test of reasonableness, both experts agreed that a valuation should be a multiple of four to nine times earnings before interest, taxes, depreciation, and amortization for companies similar to Browne Labs. Ms. Farr's valuation yielded a multiple of 4.8 to 5.0. Although Mr. Hebert's original valuation yielded a multiple of 5.68, he recalculated that number during his testimony to align with his amended valuation and stated that the amended multiple was under 4.0. Mr. Hebert acknowledged that his amended valuation "skewed the results somewhat" of the reasonableness test. In his responsive brief, Husband recalculated the multiple for Mr. Hebert's test of reasonableness at 3.5. Wife's concern regarding the test of reasonableness would hold some relevance if the trial court had wholly adopted Mr. Hebert's valuation of Browne Labs. Instead, the court requested a calculation that resulted in a valuation of $277,000.00, or $130,810.00 over Mr. Hebert's valuation. Based upon Mr.

Hebert's amended capitalized value of invested capital set at $1,598,429.00, the valuation of $277,000.00 results in a multiple of 5.71 and meets the experts' agreed test of reasonableness. We stress again that the trial court is free, in its discretion, "to place a value on a marital asset that is within the range of the evidence submitted." *See Wallace*, 733 S.W.2d at 107.

Wife also argues that the trial court erred by failing to consider Husband's prior statements valuing his ownership interest in Browne Labs. Husband had stated in a financial planning document in 2005 that the "joint asset" of Browne Labs was valued at $1,500,000.00, and on a 2008 loan application, he had listed a total net worth for himself of $2,100,000.00. As Husband points out, it is not clear from the financial planning document whether the financial planner completing the form understood that Husband owned a minority interest in Browne Labs, and the financial planner did not testify at trial. In support of her argument that the trial court should have given greater weight to Husband's estimates on these documents, Wife relies on this Court's decision in *Powell v. Powell*, 124 S.W.3d 100, 105 (Tenn. Ct. App. 2003), which affirmed the trial court's adoption of the wife's expert's valuation of the husband's business over the valuation offered by the husband's expert. In *Powell*, this Court concluded that the trial court properly considered the husband's own representation of his business's value in financial statements he had submitted to various financial institutions several months before trial as supportive of one expert's valuation over the other. *Id.* We find *Powell* to be factually distinguishable from the instant action in that the self-reporting statements at issue here were made several years before the filing of the divorce complaint, were vague in nature, and were not supportive of either expert's valuation.

Moreover, as stated in *Powell*, we note again that "[i]f the evidence of value is conflicting, the trial judge may assign a value that is within the range of values supported by the evidence." *Id.* at 105-06 (citing *Ray v. Ray*, 916 S.W.2d 469, 470 (Tenn. Ct. App. 1995)). We conclude that the evidence does not preponderate against the trial court's valuation of Husband's ownership interest in Browne Labs as $277,000.00.

## B. South Creek, LLC

In its Memorandum Opinion and Order, the trial court awarded South Creek to Husband and valued his 50% share of the company at $66,000.00. South Creek is a limited liability company ("LLC") owned equally by Husband and Mr. Norwood. South Creek owns the real property and physical plant on which Browne Labs is located. Browne Labs pays rent to South Creek. Husband presented a real estate appraisal of South Creek's holdings, which had been completed as of February 8, 2011. Wife did not object to the appraisal, which valued the real property and plant owned by South Creek at $290,000.00. The

appraisal listed South Creek's secured mortgage debt of $224,000.00, leaving $66,000.00 in equity for the real property and physical plant. Husband noted at trial that on his asset and liability statement submitted to the trial court, he had listed the full value of South Creek's property, $66,000.00, as his ownership interest in South Creek. Husband testified that the amount listed on his statement should have been halved to $33,000.00 because his ownership interest was only 50%. Nonetheless, the trial court ultimately valued Husband's interest in South Creek at $66,000.00.

Wife contends that the trial court erred by not considering additional assets attributable to South Creek and by not adopting her valuation of Husband's ownership interest at $325,000.00. She attributes the following additional assets to South Creek:

- Capital account, showing balance of $173,030.00 at the end of 2011
- Note receivable due in the amount of $134,085.00 from Browne Labs
- Note receivable due in the amount of $10,286.00 from an unknown entity
- Two vehicles, one driven by Husband and one by Mr. Norwood[3]

We agree with Wife regarding the note receivable due from Browne Labs and the two vehicles belonging to South Creek.

We first address Wife's argument that the trial court erred by not including in its valuation the $173,030.00 balance in South Creek's capital account in December 2011. Husband argues that a company's capital account typically represents partners' investment in the company and should not be included as income to a partner. "Capital represents the total cash or equivalent contributed by all the partners for the purpose of operating the partnership business, and intended by them to be at risk . . . ." *Jackson v. Parker*, 1987 WL 8311 at *2 (Tenn. Ct. App. March 24, 1987). When questioned regarding the value of a capital account, Mr. Hebert testified that a capital account is typically the investment that the partners have in the company and is not necessarily related to the fair market value of the company. We determine that the trial court did not err by excluding South Creek's capital account from its valuation of Husband's interest in the company.

As to the notes receivable, Husband acknowledges on appeal that South Creek's 2011 federal tax return showed two notes, one a $10,286.00 note held by an unidentified entity and

_____

[3]In the argument section devoted to this issue in her brief on appeal, Wife includes her contention that the trial court erred in attributing a portion of the debt to Husband for a Florida condominium that Husband owns with his father and Mr. Norwood. She includes it here because South Creek pays Husband's condominium expenses. We determine this issue to be more appropriately addressed within the distribution of marital property.

the other a $134,085.00 note held by Browne Laboratories. He argues, however, that because there was no testimony regarding the effect of the notes, the trial court properly did not consider the notes when valuing South Creek. We disagree.

Neither Ms. Farr nor Mr. Hebert were engaged to valuate South Creek, but because Browne Labs paid rent on its building and equipment to South Creek, Wife's counsel questioned Mr. Hebert regarding the relationship between the two companies. The following exchange ensued:

Wife's Counsel:     Well, if South Creek, LLC is a cash basis taxpayer and has a receivable on its books from Browne Laboratories, Inc. in excess of $100,000 and Browne Laboratories is on an accrual basis; isn't it?

Mr. Hebert:     I believe it is.

Wife's Counsel:     And so that would be a liability that would be on the books of Browne Laboratories; right?

Mr. Hebert:     I believe that's correct, yes, sir.

Wife's Counsel:     And if that liability was occurred during that particular year, it would probably also be on the income statement; wouldn't it?

Mr. Hebert:     The cost of purchases would be on the income statement, yes.

Wife's Counsel:     And did you–were you aware that there was a receivable on South Creek, LLC's books from Browne Laboratories?

Mr. Hebert:     I believe I was aware of that.

Wife's Counsel:     And did you make any adjustments with regard to that?

Mr. Hebert:     I don't recall making an adjustment for that.

. . .

-19-

| | |
|---|---|
| Wife's Counsel: | And I'll show you what I'll represent to you as South Creek's 2011 tax return or a portion thereof, and you'll notice that with regard to other current assets on Statement Number 6 at the end of the year was $145,091; correct? |
| Mr. Hebert: | Yes, sir. |
| Wife's Counsel: | And then Statement 6 with regard to the no receivable from affiliate, are you aware of any affiliate other than South Creek and Browne Laboratories? |
| Mr. Hebert: | No, sir. |
| Wife's Counsel: | And Statement 6 reflects that is in part $134,085 from the affiliate; correct? |
| Mr. Hebert: | Yes, sir. |

Upon a thorough review of the record, including South Creek's tax returns and both experts' reports as to the liabilities for Browne Labs, we conclude that the trial court erred by allowing Husband to claim the $134,085.00 note as a liability for the debtor company without valuing it as an asset for the creditor company. No further evidence was presented as to the $10,286.00 note receivable, and we determine that the evidence did not preponderate against the trial court's exclusion of this smaller note in its valuation of South Creek. Accordingly, the trial court's valuation of Husband's interest in South Creek should be increased by his 50% interest in the $134,085.00 note, or by $67,042.50.

Regarding the vehicles, Wife asserts that both Husband's truck and Mr. Norwood's truck should have been considered assets within the valuation of South Creek because both were owned by the company. Husband concedes that the two vehicles were included in the assets listed by South Creek on its 2011 federal tax return. Husband testified that the vehicle he drove was a Toyota truck purchased in 2010 for $35,000.00 to $45,000.00. While reviewing South Creek's 2011 tax return, Husband stated that South Creek's "cost or other basis" in the Toyota was listed as $22,710.00. Husband explained that Mr. Norwood's vehicle was a Ford Truck purchased in January 2010, with a "cost or other basis" for South Creek of $49,723.00 in 2011. No testimony was offered as to the fair market value of either vehicle. Husband acknowledges in his responsive brief that the trial court "may have found that the vehicles increased the value of Mr. Browne's interest in South Creek," and he opines

that this may have been one basis for the court valuing Husband's interest in the company at $66,000.00 rather than $33,000.00.

The trial court included its valuation of Husband's ownership interest in South Creek only in a chart entitled "Assets and Liabilities Division" within the court's Memorandum Opinion and Order. The court noted "(50%)" in parentheses by the heading of "So Creek Property" but listed the value of Husband's interest as double that, or the full amount of South Creek's equity in the real property and physical plant: $66,000.00. As noted above, Husband does not request a downward modification of this valuation to $33,000.00 and instead concedes that the trial court may have been allowing for additional South Creek assets, including the vehicles. Indeed, the combined "cost or other basis" listing for the two vehicles on South Creek's 2011 tax return equals $36,216.50, an amount only $3,216.50 over the value of Husband's half-interest in the real property equity. We note also that the trial court did not attribute any value in the truck Husband drives, both for business and personal purposes, to Husband personally.

We therefore conclude that the trial court's assignment of value at $66,000.00 for Husband's interest in South Creek was supported by a preponderance of the evidence as to the real property and the vehicles, but we modify the trial court's valuation to include Husband's one-half interest in the note receivable from Browne Labs, $67,042.50, increasing the total value of Husband's ownership interest in South Creek to $133,042.50. This $67,042.50 increase in value of the marital property awarded to Husband should be offset by an award to Wife comparable to the percentage of the marital property awarded to her by the trial court. *See, e.g., Anderson v. Anderson*, No. E2005-02110-COA-R3-CV, 2006 WL 2535393 at *4 (Tenn. Ct. App. Sept. 5, 2006) (increasing the trial court's valuation of the husband's minority stock interest upon holding that a marketability discount had been applied in error and awarding 42% of the increase to Wife in alignment with the trial court's distribution of marital property). We will address the exact amount of this percentage in the section of this opinion reviewing the trial court's distribution of marital property.

C.  Ice Ice Baby, LLC

In its Memorandum Opinion and Order, the trial court awarded the free-standing ice machine business, Ice Baby, to Husband and valued the business at a negative amount of $91,379.00. Wife contends that the trial court erred in its valuation both of Ice Baby and of Husband's half-interest in the company. She asks this Court to modify the valuation to zero. We conclude that the evidence does not preponderate against the trial court's valuation of Ice Baby as a business entity. We further conclude, however, that because Husband owns only a 50% interest in Ice Baby, only one-half of the liability should be allocated to Husband.

Husband and a partner, Jack Steiner, formed Ice Baby, a limited liability company, in June 2008 with the purchase and placement of a free-standing ice vending machine located on Lafayette Road in Fort Oglethorpe, Georgia. Husband and Mr. Steiner began the business by co-signing a $100,000.00 promissory note to Regions Bank to cover the approximately $90,000.00 purchase price of the machine and other expenses. Husband testified that he had intended to glean profits from Ice Baby that would contribute to private school tuition for the Children, and he acknowledged telling Wife during the marriage that Ice Baby would be a "cash cow." Despite this hope, Husband testified that at the time of trial, the vending machine's fair market value was only $8,621.00 due to depreciation and that Ice Baby was in debt for the full $100,000.00 principal of the loan. Husband further testified, as did his certified public accountant, Corinne Henderson, that by the time of trial, Husband was the sole guarantor on the promissory note. He had recently been required by Regions Bank to refinance the loan in his name only.

Wife refutes Husband's valuation of Ice Baby by presenting a financial statement, provided to Regions Bank by Husband on May 7, 2012, wherein Husband valued Ice Baby at a positive $100,000.00 and his half-share in the company at $50,000.00. Wife also noted that the 2011 federal tax return for Ice Baby demonstrated cash on hand in the amount of $1,023.00. Ms. Henderson, however, reviewed Ice Baby's 2011 tax return, which she had prepared, in full during her testimony at trial. She explained that the company claimed a loss on its 2011 tax return of $3,774.00 and that its gross receipts for the year equaled only $13,095.00. She confirmed that the net book value of the ice vending machine as of December 31, 2011, was $8,621.00. She also confirmed that Husband had been required by Regions Bank to refinance the approximately $100,000.00 loan with Husband as the sole guarantor. She stated that the balance of the principal on the original loan had remained unchanged from year to year and that Ice Baby deducted $4,111.00 in loan interest costs in 2011. Ms. Henderson acknowledged that Mr. Steiner is her brother. She said she knew he was residing in Florida and believed he was still a member of Ice Baby.

To arrive at the valuation for Husband's interest of negative $91,379.00, the trial court added the asset of the ice machine's 2011 fair market value, $8,621.00, to the $100,000.00 debt to bring Husband's net liability to $91,379.00. We determine that the evidence does not preponderate against this valuation of Ice Baby as an LLC. Despite Husband's refinancing the loan as the sole guarantor, however, the debt is still the company's debt, rather than Husband's personal debt. Husband presented no evidence to demonstrate that Mr. Steiner was no longer a member of Ice Baby. *See* Tenn. Code Ann. § 48-220-101 (2012) ("Unless otherwise provided in the articles or operating agreement, the profits and losses of an LLC must be allocated equally among the members."). We therefore modify the valuation of Husband's interest in Ice Baby to his one-half interest in the LLC, a liability of negative $45,689.50. As with the prior modification to Husband's interest in South Creek, this

$45,689.50 decrease in value of the liability allocated to Husband should be offset by an award to Wife comparable to the percentage of the marital property awarded to her by the trial court. We will address the exact amount of this percentage in the following section of this opinion reviewing the trial court's distribution of marital property.

## V. Overall Distribution of Marital Estate

Wife raises two issues on appeal relative to the trial court's overall distribution of the marital estate. She contends that the trial court erred by (1) failing to find dissipation of marital funds by Husband, thereby reducing Husband's portion of the estate and (2) awarding a greater portion of the net marital assets to Husband. We conclude that the trial court's overall distribution of the marital estate was equitable and that the percentage of net assets awarded to Wife by the trial court should guide the percentage Wife receives of the modified valuations of Husband's ownership interests in South Creek and Ice Baby, respectively.

Tennessee Code Annotated § 36-4-121(c) (2014) provides the following factors as guidance for determining an equitable division of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

-23-

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

## A. Alleged Dissipation of Marital Assets

Wife contends that the trial court erred by not finding a dissipation of marital assets by Husband pursuant to Tennessee Code Annotated §36-4-121(c)(5). The trial court found in its Memorandum Opinion and Order that "neither side adequately proved [alleged dissipation] and both have dissipated assets (See Exhibit 55)." We conclude that the evidence does not preponderate against the trial court's ruling that neither party was shown to have dissipated assets for purposes of the distribution of the marital estate.

"Dissipation of marital property occurs when one spouse uses marital property, frivolously and without justification, for a purpose unrelated to the marriage and at a time when the marriage is breaking down." *Altman v. Altman*, 181 S.W.3d 676, 681-82 (Tenn. Ct. App. 2005). The trial court's finding that "neither side adequately proved" dissipation indicates the court's understanding that "'[t]he burden of persuasion and the initial burden of production in showing dissipation is on the party making the allegation, and that party retains throughout the burden of persuading the court that funds have been dissipated.'" *See Burden v. Burden*, 250 S.W.3d 899, 919 (Tenn. Ct. App. 2007) (quoting *Wiltse v. Wiltse*, No. W2002-03132-COA-R3-CV, 2004 WL 1908803 at *4 (Tenn. Ct. App. Aug. 24, 2004)) (internal citation omitted).

As this Court has explained:

> [T]he allegedly improper or wasteful expenditure or transaction must be considered in the context of the marriage as a whole, and it must be weighed along with all the other relevant factors in the case. The factors that courts most frequently consider when determining whether a particular expenditure or transaction amounts to dissipation include: (1) whether the expenditure benefitted the marriage or was made for a purpose entirely unrelated to the marriage; (2) whether the expenditure or transaction occurred when the parties were experiencing marital difficulties or were contemplating divorce; (3) whether the expenditure was excessive or de minimis; and (4) whether the dissipating party intended to hide, deplete, or divert a marital asset.

*Altman*, 181 S.W.3d at 682-83 (internal citations and footnote omitted).

The trial court specifically referenced Exhibit 55 as illustrative of its finding regarding dissipation. Compiled personally by Husband, Exhibit 55 is an exhaustive list of expenditures, spanning the thirty months the divorce was pending prior to trial and categorizing each expenditure as attributable either to Husband or Wife. Not surprisingly, the parties interpret Exhibit 55 very differently. Wife asserts that Exhibit 55 actually supports her allegation that Husband dissipated assets because it demonstrates that during the pendency of the divorce, Husband spent $140,635.43 more than she did. Wife is referring to the "grand total" difference between expenditures Husband recorded between the parties. Husband, however, in Exhibit 55 deducted a total of $95,090.85 from the "grand total" because those funds contributed to paying such expenses as private school tuition for the parties' daughter, health care savings account deposits for the parties and their Children, repairs to the marital residence, and federal income tax payments. On appeal, Husband asserts that Exhibit 55 is simply a list of the parties' spending during the pendency of the divorce and does not support any conclusion regarding whether the spending was necessary or related to the marriage.

In regard to dissipation, Wife is primarily concerned with an increase in Husband's spending that she alleges is due to his relationship with his paramour, C.S. By the time of trial, both Husband and Wife acknowledged having become involved in new long-term romantic relationships. Husband met C.S. a pharmaceutical representative, in August 2010, nine months following Wife's filing of the divorce complaint. Wife met her paramour, K.F., a successful business owner, at approximately the same time. Wife compiled an exhibit in which she categorized Husband's expenses as "Before [C.S.]" and "After [C.S.]." The categories in Wife's exhibit are broad, and her testimony demonstrated that she generalized Husband's credit card purchases as benefitting C.S. with little specific proof.

An example of a major expense on which Wife claimed Husband dissipated funds was the cost of his housing. Wife reported in her exhibit that Husband's monthly rent increased from $516.67 to $1,781.88 after he met C.S. Testimony revealed, however, that in the first months following the parties' separation, Husband had been renting his former stepmother's cabin on a temporary basis and relocated when his former stepmother needed the residence. Husband subsequently rented a townhouse for $1,781.88 monthly in the summer of 2010. C.S. testified that in May 2012, she and her two children moved in with Husband "temporarily" when she suffered a relapse of cervical cancer. By the final day of testimony in October 2012, Husband acknowledged that in the month since the last trial day in September 2012, he had rented a house in which he, C.S., and C.S.'s two children were living, joined by the parties' Children during alternate weeks. Husband paid approximately $2,500.00 a month in rent regarding this house, and a real estate description of the home demonstrated that it was comparable in size to the marital residence.

Wife continued to live in the marital residence, joined by the Children on alternate weeks, throughout the pendency of the divorce. At the time of trial, the marital residence had been for sale for several months, but the parties' had received no offers to purchase the home. Wife testified at trial that she was willing to move out of the marital residence and find other housing if Husband wanted to live there instead. On appeal, she argues that Husband could have relocated into the marital residence rather than renting another house and that this would have prevented dissipation of marital funds. Wife testified that she had looked at rental properties for herself and the Children in the price range of $2,000.00 to $2,500.00 monthly. She presented no proof regarding specifically what her new living situation would have been. Clearly, with the marital residence for sale, neither party could be assured of remaining in the home.

Wife also alleges that Husband enjoyed eighteen vacations in less than two years and was accompanied by C.S. on ten of those. Husband testified that most of his travels were for conferences or sales on behalf of Browne Labs and were not vacations. C.S. testified that when she accompanied Husband, she often paid at least half of the expenses if the trip was not for Browne Labs' business. C.S. maintained that she earned an annual salary of approximately $110,000.00. Husband acknowledged that he bought some presents for C.S. during the pendency of the divorce, including a bicycle and some jewelry.

Testimony and financial records demonstrated that Husband withdrew $4,472.71 from the parties' joint checking account on January 29, 2010, the day after Wife filed the complaint for divorce. Testimony and bank records also demonstrated that Wife withdrew $15,000.00 from the parties' Home Equity Line of Credit account during the same week. The trial court found that both parties had dissipated funds to some extent but that neither had carried the burden of proving dissipation that equitably could be assessed against either

party's share of the marital estate. Although Husband cannot be said to have spent frugally, the record demonstrates that he did maintain his business interests, including the expenses he had typically incurred during the marriage for entertaining clients and traveling to conferences, while he also consistently paid the mortgage payments, utilities, and repair expenses for the marital residence.

Wife also asserts that if the purchase price Husband paid for his father's stock shares in Browne Labs was a "gross overvaluation," as the trial court found, it follows that Husband's payment of this price dissipated marital assets. We disagree. Husband entered the stock option agreement with his father seven years before the divorce action began. The decision to buy the stock was made long before the parties were known to have contemplated divorce, and the periodic accumulation of ownership interest in Browne Labs was for the benefit of marital property, even if overvalued. Moreover, once a pattern of spending has been established as typical during the marriage, a trial court is not to consider it as dissipation. *See Altman*, 181 S.W.3d at 683 n.5 ("The timing of the expenditure or transaction is extremely relevant. It is unlikely that expenditures that were typical or commonplace during the marriage will constitute dissipation, especially when the other spouse acquiesced in them."). The evidence does not preponderate against the trial court's determination that Husband should not be found as having caused dissipation of the marital estate.

B. Equitable Distribution of Marital Estate

Wife primarily grounds her contention that the trial court erred by inequitably dividing the marital property through her appellate arguments that the court erred in its valuation of Husband's business ownership interests and failed to find dissipation of marital assets by Husband. Wife further contends that even without any modification of the values set by the trial court, the property was divided inequitably because Husband received a greater percentage of the net value. Wife argues that the trial court should have awarded her at least 50% of the marital property pursuant to the statutory factors delineated in Tennessee Code Annotated § 36-4-121. According to the trial court's valuation of the distribution, Husband was awarded 52% of the marital estate, and Wife was awarded 48%.[4] We conclude that this overall distribution percentage ratio was equitable and should be applied to the increased valuations of South Creek and Ice Baby, respectively, set out above.

_____

[4]We are unpersuaded by Husband's "range of value" argument on appeal that the net value of the trial court's distribution was actually closer to 50-50 or by his argument that we should consider the distribution 50-50 because Wife had allegedly greater access to liquidated assets.

In its Memorandum Opinion and Order, the trial court distributed the marital estate according to the following chart:

ASSETS AND LIABILITIES DIVISION

| | DEBT | COURT'S VALUE | AWARDED TO |
|---|---|---|---|
| Marital Home | | $ 385,000 | Sell and equally divide profit or deficiency |
| Adagio Condo | | $ (111,684) | Husband |
| Wife's home furnishings | | $ 5,000 | Wife |
| Husband's home furnishings | | $ 15,000 | Husband |
| Browne Labs | | $ 277,000 | Husband |
| Browne Labs 2010 tax refund | | unknown | ½ to each |
| Ice Baby | $ (100,000) | $ (91,379) | Husband |
| So Creek Property (50%) | | $ 66,000 | Husband |
| Ally | | $ 513 | Husband |
| American Express | | $ (3,357) | Husband |
| Black Creek | | $ (359) | Husband |
| Capital One | | $ (3,762) | Husband |
| Citi Card | | $ (7,000) | Husband |
| Discover | | $ (86) | Husband |
| FIA Visa | | unknown | Husband |
| FSG Bank Checking | | $ 150 | Husband |
| IRA 31[--] | | $ 108,318 | divide equally between parties |
| IRA 41[--] | | $ 84,000 | Wife |

| | | | |
|---|---|---|---|
| IRA 46[--] | | $ 18,000 | Wife |
| Regions checking - 31[--](jt) | | $ 0 | Husband |
| Regions checking - 23[--] (Ice Baby) | | $ 0 | Husband |
| Regions checking - 37[--] | | $ 3,000 | Husband |
| Regions checking - 39[--] | | $ 300 | Wife |
| Regions checking - 48[--] | | $ 13,000 | Wife |
| Regions Money Marke[t] 30[--] | | $ 5,871 | Wife |
| Regions savings - 58[--] | | $ 0 | Husband |
| West Coast Life $750,000 | | | for benefit of children |
| Alleged Dissipation | | $ 0 | neither side adequately proved and both have dissipated assets (See Exhibit 55) |

Husband's share - $198,195
Wife's share - $180,330

The trial court valued Husband's net assets after distribution at $198,195.00, or 52%, and Wife's net assets at $180,330.00, or 48% of the marital estate. The court assigned the obligation of all marital debts to Husband. As recognized above, "[t]his Court gives great weight to the decisions of the trial court in dividing marital assets and 'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *See Keyt*, 244 S.W.3d at 327 (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)). This Court has also previously elucidated:

The approach to dividing a marital estate should not be mechanical, but rather should entail carefully weighing the relevant factors in Tenn. Code Ann. § 36-4-121(c) in light of the evidence that the parties have presented. Trial courts have broad discretion in fashioning an equitable division of marital property, and appellate courts must accord great weight to a trial court's

-29-

division of marital property. Accordingly, it is not our role to tweak the manner in which a trial court has divided the marital property. Rather, our role is to determine whether the trial court applied the correct legal standards, whether the manner in which the trial court weighed the factors in Tenn. Code Ann. § 36-4-121(c) is consistent with logic and reason, and whether the trial court's division of the marital property is equitable.

*Owens v. Owens*, 241 S.W.3d 478, 490 (Tenn. Ct. App. 2007) (internal citations omitted); *see also Payne v. Payne*, No. E2006-02467-COA-R3-CV, 2007 WL 2668588 at *4 (Tenn. Ct. App. Sep. 12, 2007) ("The division of the estate is not rendered inequitable simply because it is not mathematically equal, or because each party did not receive a share of every item of marital property.") (internal citations omitted).

Wife argues that a distribution of at least 50% of the marital estate to her is supported by the following statutory factors in pertinent part: (1) duration of marriage; (2) employability of parties; (3) contribution to the other party's earning power; (4) ability to acquire future capital assets and income; (5) contribution to the acquisition, preservation, appreciation, depreciation or dissipation of marital property; (8) economic circumstances of parties at the time of divorce; and (10) the amount of social security benefits available to each party. *See* Tenn. Code Ann. § 36-4-121(c). Wife notes that there was no proof of separate property or significant assets before the marriage (factors (6) and (7)). *See id.* She also accurately notes that no proof was presented regarding tax consequences to either party (factor (9)). *See id.*

The trial court did not specifically address each of the statutory factors in its Memorandum Opinion and Order. The court did, however, specifically find that this case involves an eighteen-year marriage with the parties having been separated for three years preceding trial. The court further found, as noted above, that neither party had carried his or her burden of proof as to dissipation of assets. Regarding employability, the court noted in its alimony analysis (to be addressed fully below) that Wife held a college degree in education but had not sought employment throughout the pendency of the divorce. It is undisputed that Wife had contributed to the marriage and to the accumulation of marital assets by acting as a homemaker and caretaker of the Children while Husband continued to build the businesses. Wife also contributed for approximately a year in 1997 as an employee of Husband's primary business, Browne Labs, and Husband testified that Wife did so competently.

The trial court imputed the ability to earn at least minimum wage of $1,257.00 monthly to Wife, which considering her college degree, age, and essentially good health is certainly reasonable. Wife clearly had a lesser ability than Husband to acquire future capital

assets and income as an individual, and her future economic circumstances were thus more dependent upon the distribution of the marital estate than were Husband's future circumstances. Although Wife argued that Husband had paid insufficient spousal and child support during the first year of the parties' separation, he did pay a total of $7,400.00 to Wife between January 2010 and January 2011, and by agreement, consistently paid $500.00 weekly to Wife from January 2011 through trial. Based upon the applicable statutory factors and the trial court's broad discretion regarding this issue, we find no error in the trial court's overall distribution of marital property.

Finally, we must address one disputed debt attributed completely to Husband by the trial court and thus lowering the court's valuation of Husband's net assets. Husband holds a 25% ownership interest in a vacation condominium adjoining a golf course located in Florida. Mr. Norwood also owns 25% of the condominium while Husband's father owns the remaining 50% share. Pertinent testimony demonstrated that the ownership partners purchased the condominium for $815,000.00 in 2005, with a total original debt of $860,000.00. The partners used the condominium for entertainment of Browne Labs' clients, rental to outside parties, and personal vacations. Husband testified that the condominium had been appraised in 2010 for $440,000.00, leaving the partners "under water" with negative equity. The trial court awarded the condominium to Husband and valued Husband's one-quarter share at negative $111,684.00.

Wife asserts that South Creek typically paid all expenses for the condominium and that Husband should receive no "negative value" for the outstanding debt. Husband asserts that he received no benefit that should be considered income from South Creek for the condominium. Husband testified that he had not paid any condominium expenses "out of pocket" because South Creek had paid those expenses on his behalf. Ms. Henderson testified that she had included a Schedule E for rental income on the condominium when she prepared South Creek's 2011 federal tax return. According to Ms. Henderson, the condominium was available for rent only 104 days of the year, and Husband's total share of rental income in 2011 was $11,954.00. The total expenses that South Creek was able to deduct for the condominium in 2011 equaled $28,626.00, and Ms. Henderson opined that the condominium was a liability for Husband. Because the trial court did not deduct any portion of Husband's ownership interest in the condominium from its valuation of Husband's interest in South Creek, we determine that the evidence did not preponderate against the trial court's inclusion of Husband's one-quarter interest in the condominium as a liability for him in the overall distribution of the marital estate.

Upon a thorough review of the record, we conclude that the preponderance of the evidence supports the trial court's equitable division of the marital estate. In keeping with the trial court's intended distribution of the marital estate, we award Wife 48% of the

valuation increases for South Creek and Ice Baby previously determined in this opinion. *See, e.g., Barnes v. Barnes*, No. M2012-02085-COA-R3-CV, 2014 WL 1413931 at *9 (Tenn. Ct. App. Apr. 10, 2014) (increasing the trial court's valuation of the husband's dental practice because a marketability discount had been applied in error and awarding half of the increase to the wife in accordance with the trial court's equal distribution of property) (citing with approval *Anderson*, 2006 WL 2535393 at *4, in which this Court awarded 42% of a modified business valuation to the wife in accordance with the trial court's distribution percentage). We further conclude that the percentages calculated and established based on the trial court's order support such equitable division of assets.

We therefore award Wife $32,180.40 to account for her 48% portion of the modified value of South Creek plus $21,930.96 to account for her 48% portion of the modified value of Ice Baby. As noted previously, Ice Baby is valued as a liability, but because this liability had decreased the total of Husband's net assets, Wife's portion of the modification is a positive value. The total modification results in an increased award to Wife in the amount of $54,111.36. We remand to the trial court solely for a determination regarding the proper method of distribution for this additional award to Wife.

## VI. Duration of Rehabilitative Alimony

Wife contends that the trial court erred by reducing the duration of its original award to Wife of $6,500.00 in monthly rehabilitative alimony from seven years to five years in response to Husband's motion to alter or amend the judgment, filed approximately three weeks following entry of the trial court's Memorandum Opinion and Order. Husband maintains that the trial court properly reduced the duration of alimony because during the three years the divorce was pending, Wife had failed to make progress toward rehabilitating her earning capacity. We conclude that the evidence does not preponderate against the trial court's reduction of the alimony award duration from seven to five years.

Tennessee law recognizes four types of spousal support: (1) alimony *in futuro*, also known as periodic alimony; (2) alimony *in solido*, also known as lump-sum alimony; (3) rehabilitative alimony; and (4) transitional alimony. Tenn. Code Ann. § 36-5-121(d) (2014); *Mayfield*, 395 S.W.3d at 115. Our statutory scheme indicates a legislative preference favoring the short-term types of spousal support, rehabilitative and transitional alimony, over the long-term types of support, alimony *in futuro* and alimony *in solido*. *See* Tenn. Code Ann. § 36-5-121(d)(2)-(3); *Mayfield*, 395 S.W.3d at 115; *Riggs v. Riggs*, 250 S.W.3d 453, 456 (Tenn. Ct. App. 2007). Rehabilitative alimony, at issue in the case at bar, "'is designed to increase an economically disadvantaged spouse's *capacity* for self-sufficiency.'" *See Mayfield*, 395 S.W.3d at 115 (quoting *Gonsewski*, 350 S.W.3d at 109 (emphasis in original)).

It is well settled that "trial courts in Tennessee have broad discretion to determine whether spousal support is needed and, if so, to determine the nature, amount, and duration of the award." *Id.* at 114; *see also Fickle v. Fickle*, 287 S.W.3d 723, 736 (Tenn. Ct. App. 2008). Tennessee Code Annotated § 36-5-121(i) (2014) provides that when determining the nature and amount of an alimony award, the trial court should consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

-33-

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

"Although each of these factors must be considered when relevant to the parties' circumstances, 'the two that are considered the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay.'" *Gonsewski*, 350 S.W.3d at 110 (quoting *Riggs*, 250 S.W.3d at 457).

In awarding the original amount and duration of rehabilitative alimony, the trial court stated in pertinent part:

> This is an 18 year marriage. The parties have been separated for three years. Husband has paid substantial support since January 2010. Wife has a college degree in education, but has not sought employment. She requests to be a stay at home mom though both children are school age.

> The Court considers a number of statutory factors in determining the nature and amount of alimony: [delineated statutory factors pursuant to Tennessee Code Annotated § 36-5-121(i).]

> Wife was only 40 years of age at the time of the divorce and apparently has no serious health concerns. She also has a college education. Wife is an appropriate candidate for rehabilitative alimony, which purpose is to assist her in obtaining additional education, jobs skills or training in order to move on with her life and become more self sufficient. It is highly unlikely that either of the parties will be able to maintain the standard of living they had and enjoyed prior to this divorce. However, given Wife's age, condition of her health, education and previous positions, Wife should be able to reach self-sufficiency with rehabilitative alimony for a period of seven years. Wife requests $10,000.00 a month for two years and $6,000.00 a month for seven years in support. The Court finds that based upon all the circumstances and facts of this case that $6,500.00 per month is reasonable for the seven year period.

In subsequently reducing the duration of its rehabilitative alimony award to Wife, the trial court stated in pertinent part:

The Court finds that after reconsideration of the proof at trial, [Wife's] alimony should be reduced to a five year period given that during the last three years she has failed to move forward with her own rehabilitation.

Wife does not dispute on appeal the amount of the trial court's original award of rehabilitative alimony. Wife argues primarily that the court erred by reducing the duration of rehabilitative alimony because it had already taken note in its original Memorandum Opinion and Order of Husband's temporary support of Wife during the pendency of the divorce. This argument does not address the trial court's central rationale for reducing the duration of its award: that Wife had "failed to move forward with her own rehabilitation." Wife does assert that the following statutory factors, relative to her potential rehabilitation, weigh in favor of a longer period of rehabilitative alimony: (2) relative education and training of each party and (6) extent to which it would be undesirable for a custodian of a minor child to work outside the home. *See* Tenn. Code Ann. § 36-5-121(i).

As to Wife's education and training, it is understandable that Wife is unable to immediately enter the work force as a teacher, as she earned her education degree fourteen years before filing for divorce and had never sought a license to teach. These obstacles are not insurmountable, however, whether Wife's chosen employment were to be teaching or another career requiring further training. Wife acknowledged at trial that she had made no effort toward securing employment, further training, or licensure. She maintained that the Children, aged thirteen and seven at time of trial, needed her available at all hours and on all days of the week despite their residing alternate weeks with Husband. Wife also maintained, in agreement with Husband, that the parties' daughter should remain enrolled at a private school with a tuition of approximately $24,000.00 a year and that after their son advanced beyond elementary school, he should also attend private school.

Both Husband and Wife testified that they decided together in their marriage that Wife should remain home with the Children during pre-school years. Wife further testified that her understanding had been that she would remain a stay-at-home mother throughout the Children's school years, and she expressed concern that Husband would have a tendency to call on her for emergency child care even during his co-parenting time. Husband disputed this testimony somewhat and stated that he had expected Wife to begin working outside the home when the youngest child entered school. Unfortunately, the economic reality of the parties' situation in divorce renders this dispute somewhat moot. *See Mayfield*, 395 S.W.3d at 116 ("Although the parties' standard of living is a factor courts must consider when making alimony determinations, *see* Tenn. Code Ann. § 36-5-121(i)(9), the economic reality is that the parties' post-divorce assets and incomes often will not permit each spouse to maintain the same standard of living after the divorce that the couple enjoyed during the

-35-

marriage."). The trial court did not err in reducing the duration of the award to Wife of $6,500.00 monthly in rehabilitative alimony from seven to five years.

## VII. Determination of Husband's Income for Child Support Purposes

Wife contends that the trial court erred by setting Husband's income for child support purposes based only upon his claimed earnings from Browne Labs and South Creek. She argues that the trial court failed to consider additional sources of income, particularly fringe benefits that are to be calculated in setting child support, pursuant to the Child Support Guidelines. She also argues that Browne Labs' records demonstrate loan repayments to Husband that should have been considered income. Husband contends that the trial court properly calculated his income because Wife failed to prove the personal value of any business fringe benefits and because loan repayments from his business did not constitute new income. We agree with Husband on this issue.

As noted previously, " we review child support decisions using the deferential 'abuse of discretion' standard of review," which "requires us to consider (1) whether the decision has a sufficient evidentiary foundation, (2) whether the court correctly identified and properly applied the appropriate legal principles, and (3) whether the decision is within the range of acceptable alternatives." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000). *See also Massey v. Casals*, 315 S.W.3d 788, 798 (Tenn. Ct. App. 2009) ("We note that determinations of child support lie within the discretion of the trial court.").

The applicable definition of gross income as provided in the Child Support Guidelines is as follows in pertinent part:

Gross income of each parent shall be determined in the process of setting the presumptive child support order and shall include all income from any source (before deductions for taxes and other deductions such as credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following:

(i) Wages;

(ii) Salaries;

(iii) Commissions, fees, and tips;

(iv) Income from self-employment;

-36-

(v) Bonuses;

(vi) Overtime payments; . . .

Tenn. Comp. R. & Regs., ch. 1240-02-04-.04.3(a)(1).

The Child Support Guidelines also provide the following regarding the inclusion as income of fringe benefits:

> 4.      Fringe Benefits.
>
> (i)      Fringe benefits for inclusion as income or "in-kind" renumeration received by a parent in the course of employment, or operation of a trade or business, shall be counted as income if they reduce personal living expenses.
>
> (ii)     Such fringe benefits might include, but are not limited to, company car, housing, or room and board.
>
> (iii)    Basic Allowance for Housing (BAH), Basic Allowance for Subsistence (BAS), and Variable Housing Allowances (VHA) for service members are considered income for the purposes of determining child support.
>
> (iv)     Fringe benefits do not include employee benefits that are typically added to the salary, wage, or other compensation that a parent may receive as a standard added benefit (e.g., employer-paid portions of health insurance premiums or employer contributions to a retirement or pension plan).

Tenn. Comp. R. & Regs., ch. 1240-02-04-.04.3(a)(4).

In setting Husband's child support obligation in the amount of $2,723.00 monthly, the trial court made the following findings of fact in its Memorandum Opinion and Order:

> The Court finds that the [parties'] child support obligations should be based upon an average income for the Husband of $350,000.00 per year and Wife's income should be set at minimum wage in Tennessee. Husband will

receive the tax deductions for both of the parties' minor children. The Husband shall provide medical and dental insurance for the parties' minor children and the cost of uncovered expenses shall be borne eighty percent (80%) by Husband and twenty percent (20%) by Wife.

The trial court based its determination of Husband's gross yearly income upon his 2011 W-2 statement from Browne Labs, listing annual gross income in the amount of $310,339.00, and his personal financial statement, listing annual gross income in the amount of $37,244.00 from South Creek. The trial court added these two income sources together and rounded the sum to $350,000.00 to reach an "average income" for Husband.

Wife asserts that several fringe benefits afforded to Husband from Browne Labs should have been included in his income, including his vehicle and related costs, home internet, a cellular telephone package, country club membership and expenses, travel, entertainment, and use of the Florida condominium. Husband asserts that with the exception of the condominium and vehicle, the benefits listed by Wife are either business expenses necessary for entertaining clients or, in the case of his personal use, are expenses the company's bookkeeper tracks and for which he reimburses Browne Labs.

As to the condominium, having previously determined that the evidence did not preponderate against the trial court's inclusion of Husband's one-quarter interest in the condominium as a liability for him in the overall distribution of the marital estate, we determine that the trial court properly did not consider the condominium a fringe benefit in calculating Husband's income.

In regard to the Toyota truck provided to Husband by South Creek, Ms. Henderson, who had prepared South Creek's tax returns for four years, reviewed the depreciation and amortization form filed with South Creek's 2011 federal tax return. She testified that the amount of $19,004.00 claimed by South Creek as automobile lease income represented "the personal use that the owners have of the vehicle, they record the income. I mean, it's basically the way that you do right by Uncle Sam for using vehicles – company vehicles for personal use." Husband testified that Browne Labs paid for gasoline and maintenance on his truck. He further testified that he used both company and personal credit cards in purchasing gasoline, with only the company charges paid by Browne Labs. Wife prepared an exhibit in which she categorized what she believed to be Husband's income from South Creek, but this exhibit included no itemization of personal versus business gasoline purchases. We determine that because Husband paid a leasing fee to Browne Labs for the use of his "company car," the evidence did not preponderate against the trial court's exclusion of the vehicle use from Husband's income. We note that our prior review of the trial court's

valuation of South Creek considered the value of the company vehicles, including the truck used by Husband, as assets attributable to South Creek.

As to expenses paid by Browne Labs for Husband's cellular telephone package, travel, entertainment, and country club membership, Husband testified that Browne Labs provided these expenses primarily to facilitate his contact with and entertainment of clients for the purposes of sales and marketing. Browne Labs listed an amount of $9,339.00 as "fringe benefit" on Husband's W-2 statement. Ms. Henderson testified that Browne Labs prepared its own W-2 forms and that she did not know specifically which expenses were included in the "fringe benefit" attributed to Husband. Ms. Henderson explained that a fringe benefit is listed on a W-2 for "informational purposes" and is not included in income. She opined that the amount could refer to an insurance benefit and that there was no way to be sure from the W-2 statement. Upon our careful review of the record, we conclude that the preponderance of the evidence was insufficient to demonstrate that these expenses paid by Browne Labs reduced Husband's personal living expenses pursuant to the definition of fringe benefits within the Child Support Guidelines. Tenn. Comp. R. & Regs., ch. 1240-02-04-.04.3(a)(4)(i).

Wife also argues that a reduction in the loan balance that Browne Labs owed to shareholders during the pendency of the divorce should be added to Husband's income. It is undisputed that Husband and Mr. Norwood, as shareholders, had loaned an amount to Browne Labs that, as reflected on the 2011 business tax return, had accrued to $274,954.00. Testimony and financial records demonstrated that by March 31, 2012, this loan had been reduced to $56,268.00, meaning that a balance of $218,686.00 had been repaid to shareholders in the interim. Husband acknowledged at trial that he had taken $71,000.00 as loan repayment from Browne Labs in 2011, but he stressed that these funds had previously been attributed to him as income. Wife asserts that the trial court should have treated this amount of $71,000.00 as an average of Husband's yearly "income" from loan repayments and added it to his base income. We disagree.

When questioned regarding loan repayments made by Browne Labs to Husband and Mr. Norwood, Ms. Henderson explained:

> I think that they often make loans to the company, which is a pretty common practice in a C-corp, for owners to bonus out the income and then, you know, cash might be tight so they'll loan the money back in. So we bonus it out so we get the deduction for it so that we don't pay tax at the corporate level.

-39-

According to Ms. Henderson, the money repaid to the shareholders from the company has been previously accounted for in the shareholders' earlier W-2s. She further explained: "If he receives proceeds as a repayment of a loan that he's made, whether it's from Browne or anybody else, it's just not income. It's repayment of after-tax dollars, money that's already been taxed that he loaned, whether it's to Browne Labs or anybody else."

In support of her argument, Wife relies on this Court's decision in *Pruett v. Pruett*, E2007-00349-COA-R3-CV, 2008 WL 182236 at *8 (Tenn. Ct. App. Jan. 22, 2008), for the proposition that whether the Internal Revenue Service classifies Husband's loan repayment funds as income in the year he draws them is not conclusive as to whether those amounts should be included as income for the purpose of calculating child support. We agree with Wife on this point, but we find the circumstances in *Pruett* to be factually distinguishable from the instant action. In *Pruett*, the father was the sole owner or operator of several businesses and possessed ownership interests in several more. *Id.* at 9. The *Pruett* father claimed widely variable income from one year to another and utilized loan repayment to his businesses as what the trial court found were "'multiple tax devices which while legal from an IRS standpoint artificially reduce[d] his income for child support purposes.'" *Id.* at 8. In this case, Husband was a minority interest holder in Browne Labs and could not unilaterally exercise control over his cash flow without being held accountable to the other shareholders. His financial history also reflected a fairly consistent rate of reported personal income from Browne Labs. Upon our thorough review of the record and the specific facts in this case, we conclude that the evidence does not preponderate against the trial court's determination of Husband's income for child support purposes without inclusion of fringe benefits or repaid loans.

## VIII. Attorney's Fees

Wife contends that the trial court erred by awarding her $45,000.00 in attorney's fees and expenses rather than her requested amount of $94,387.87. Wife's affidavit of attorney's fees and expenses, filed post-trial at the trial court's request, itemized $73,504.70 in attorney's fees, $2,101.40 in expenses, and $18,781.87 in expert fees. She asserts that the court found no unreasonableness in the fees and argues that as the financially disadvantaged party, she should not be placed in a situation where she has to use other resources awarded to her in order to pay attorney's fees and expenses. We conclude that the trial court did not abuse its discretion by awarding Wife $45,000.00, or slightly under half, of her requested attorney's fees and expenses.

In granting Wife's request in part, the trial court stated that the award of attorney's fees was fundamentally an award of alimony *in solido*, and we treat it as such. *See Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Houghland v. Houghland*, 844

S.W.2d 619, 623 (Tenn. Ct. App. 1992). The trial court's decision regarding attorney's fees in a divorce proceeding is within the sound discretion of the trial court and will not be disturbed upon appeal unless the evidence preponderates against it. *Storey*, 835 S.W.2d at 597. As our Supreme Court has stated:

> The trial court's determination of a reasonable attorney's fee is "a subjective judgment based on evidence and the experience of the trier of facts," and Tennessee has "no fixed mathematical rule" for determining what a reasonable fee is. Accordingly, a determination of attorney's fees is within the discretion of the trial court and will be upheld unless the trial court abuses its discretion. We presume that the trial court's discretionary decision is correct, and we consider the evidence in the light most favorable to the decision. The abuse of discretion standard does not allow the appellate court to substitute its judgment for that of the trial court, and we will find an abuse of discretion only if the court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party."

*Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011) (internal citations omitted).

In this case, we have determined that the trial court properly awarded Wife rehabilitative alimony because, *inter alia*, she was the economically disadvantaged spouse and would need additional training and perhaps licensure to begin earning a salary that would allow a lifestyle at all comparable to that which she enjoyed during the marriage. We agree with the trial court that Wife was also entitled to an award of attorney's fees as alimony *in solido* for similar reasons. We discern no abuse of discretion, however, in the trial court's limiting this award to the amount of $45,000.00. Wife received sufficient assets in the division of marital property with which she could pay the balance of her attorney's fees, particularly in light of the additional award made herein due to modified valuations of South Creek and Ice Baby.

## IX. Conclusion

For the reasons stated above, we increase the trial court's valuation of Husband's ownership interest in South Creek by the amount of $67,042.50 for a total valuation of Husband's interest at $133,042.50. We also reduce the trial court's allocation to Husband of the liability for the value of Ice Baby by one-half, or $45,689.50. These modifications, taken together, increase the value of Husband's net assets awarded by the trial court by the amount of $112,732.00. We award to Wife $32,180.40 to account for her 48% portion of the

modified value of South Creek plus $21,930.96 to account for her 48% portion of the modified value of Ice Baby, resulting in a total increased award to Wife in the amount of $54,111.36. We remand to the trial court solely for a determination regarding the proper method of distribution for this additional award to Wife. We affirm the trial court's judgment in all other respects. Costs on appeal are assessed equally to both parties.

_____

THOMAS R. FRIERSON, II, JUDGE